**QUEEN'S FLOWERS de COLOMBIA, et al., Plaintiffs,**

**v.**

**UNITED STATES, Defendant.**

Slip Op. 96–152.
Court No. 96–08–01921.

United States Court of
International Trade.

Aug. 30, 1996.

---

Arnold & Porter (Michael T. Shor, William L. Busis), Washington, DC, for plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Velta Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Lucius B. Lau, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC, for U.S.

### MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

POGUE, Judge:

This matter is before the court on the motion of plaintiffs, 20 individual privately-held producers and exporters of fresh cut flowers from Colombia, and three related importers in the United States, for a preliminary injunction to enjoin liquidation of entries [1] and to prevent collection of antidumping duty deposits. The deposits were set in a United States Department of Commerce ("Commerce") final determination, which plaintiffs contend is illegal. *See Certain Fresh Cut Flowers from Colombia,* 61 Fed. Reg. 42833 (Aug. 19, 1996) (final results admin. reviews).

The 20 producers/exporters consist of the following Colombian companies: (1) Queen's Flowers de Colombia Ltda., (2) M.G. Consultores Ltda., (3) Agroindustrial del RioFrio Ltda., (4) Cultivos Generales Ltda., (5) Floranova Ltda., (6) Flores Atlas Ltda., (7) Flores Calima S.A., (8) Flores de Bojaca Ltda., (9) Flores del Halo Ltda., (10) Flores el Aljibe S.A., (11) Flores el Cacique Ltda., (12) Flores Canelon Ltda., (13) Flores el Cipres Ltda., (14) Flores el Roble, (15) Flores el Tandil Ltda., (16) Flores Jayvana Ltda., (17) Flores la Mana S.A., (18) Flores la Valvanera Ltda., (19) Jardines de Chia Ltda., and (20) Jardines Fredonia Ltda.

The three U.S. importers are: (1) Queen's Flowers Corp., based in Miami, Florida, (2) Atlas Flowers, Inc. d/b/a Golden Flowers, located in Miami, Florida, and (3) Florexpo, located in Carlsbad, California.

In its Final Results for the consolidated fifth, sixth and seventh administrative reviews of the antidumping order on *Certain Fresh–Cut Flowers From Colombia,* 61 Fed. Reg. 42833, the Department of Commerce International Trade Administration ("ITA") determined that all 20 flower producing companies were related, and collapsed them into a single entity called the "Queen's Flowers Group." ITA did not calculate dumping margins for this group based on data submitted by the companies. Instead, ITA applied a best information available rate ("BIA") of 76.60 percent to all 20 companies for each of the three one-year periods of review, and for future cash deposits. The margins found for other Colombian producers were in the range of 0 to 5 percent.

### BACKGROUND

Following investigations by the Department of Commerce and the U.S. International Trade Commission, an antidumping duty order was entered against Certain Fresh Cut Flowers From Colombia in 1987. That antidumping duty order covered standard carna-

---

**1.** In their application for relief, plaintiffs seek a preliminary injunction to enjoin liquidation of entries of fresh cut flowers from Colombia which are the subject of the administrative determination *Certain Fresh Cut Flowers from Colombia,* 61 Fed.Reg. 42833 (Aug. 19, 1996) (final results admin. reviews). Defendant consents to the injunction if plaintiffs post a bond in an amount set by the court. The court, having set the bond amount at $1,500,000.00 dollars, and having considered the agreed upon preliminary relief in light of the court's other findings, *infra,* granted this portion of plaintiffs' requested relief.

tions, miniature carnations, standard chrysanthemums, and pompom chrysanthemums. *See Certain Fresh Cut Flowers From Colombia,* 52 Fed.Reg. 6492 (Mar. 18, 1987) (amend. final determination).

Prior to the August 19, 1996 publication of the final results in the consolidated fifth, sixth, and seventh administrative reviews of the *Fresh Cut Flowers From Colombia* antidumping duty order, covering entries made between March 1, 1991 and February 28, 1994, plaintiffs' exports to the United States were subject to antidumping duty deposit rates ranging between 0% and 3.13%.

ITA initiated the fifth review (covering entries between March 1, 1991 and February 29, 1992) on May 21, 1992. ITA initiated the sixth review (covering entries between March 1, 1993 and February 28, 1994) on May 2, 1994. It sent out separate Section A questionnaires (requesting corporate structure information and aggregate sales data) for the fifth and sixth reviews on November 9, 1993. ITA initiated the seventh review on May 2, 1994, and sent out Section A questionnaires on April 22, 1994. ITA later consolidated the fifth, sixth, and seventh administrative reviews (covering entries between March 1, 1991 and February 28, 1994). It issued Sections C and D of its questionnaire, requiring all cost and U.S. sales data, for all three review periods. These responses were filed in July and August of 1994.

Nine of the twenty plaintiff producers were included within Commerce's Notices of Initiation for the fifth, sixth, or seventh administrative reviews. These nine companies were: (1) Queen's Flowers de Colombia Ltda., (2) Jardines de Chia Ltda., (3) Jardines Fredonia Ltda., (4) Agroindustria del RioFrio Ltda., (5) Flores el CaneIon Ltda., (6) Flores del Halo Ltda., (7) Flores la Valvanera Ltda., (8) M.G. Consultores Ltda., and (9) Cultivos Generales Ltda. (previously Flores Generales). Cultivos Generales and Fredonia, however, certified that they did not produce or export subject merchandise to the United States during the periods of review.

No review was requested for the remaining 11 companies, and thus none were included in any of ITA's three notices of initiation.

In the preliminary results issued on June 8, 1995, ITA determined to apply first-tier best information available (BIA) rates to eight companies. Although all the companies provided responses to ITA's initial questionnaire and supplemental questionnaires, ITA preliminarily determined that these respondents had impeded its investigation, and ITA thus applied an uncooperative, first-tier BIA rate. This rate, equal to the highest rate ever determined for any producer in any review, was 75.92 percent for the fifth administrative review period, and 83.61 percent for the sixth and seventh administrative review periods. *Certain Fresh Cut Flowers From Colombia,* 60 Fed.Reg. 30270, 30272–73 (June 8, 1995) (prelim. results admin. review).

Previously, ITA had delivered a November 17, 1994 decision memoranda to the eight companies explaining why the companies were collapsed, and a December 5, 1994 analysis memorandum itemizing deficiencies in their questionnaire responses that according to ITA justified use of BIA.

On May 26, 1995, ITA issued Section A questionnaires covering all three review periods to the 12 producer plaintiffs not covered in the preliminary determination. It issued supplemental questionnaires to these companies on July 21, 1995. Timely responses were provided by all companies on June 13, 1995 and July 28, 1995, respectively. On August 3, 1995 the ITA issued a decision memoranda analyzing the relatedness of the original eight parties.[2] That memoranda determined that the companies were related. In briefs submitted on August 11, 1995 and August 23, 1995, and in a hearing held on September 8, 1995, plaintiffs challenged ITA's decision to apply BIA based on plaintiffs' failure to provide related party information. Subsequently, on February 1, 1996, the ITA issued a memoranda analyzing the relat-

**2.** The parties analyzed were: M.G. Consultores, Flores Canelon, Flores la Valvanera, Flores del

Halo, Agroindustria del RioFrio, Jardines de

edness of the twelve other companies [3] to the earlier eight. That memoranda determined that all twenty companies were related. Through a written submission made on July 26, 1995, the companies presented information challenging the ITA's list of deficiencies. The companies also contended that ITA, in asserting that the companies were related and should be collapsed, never performed the required statutory analysis to determine whether the companies were related parties.

On June 28, 1996, the ITA issued a memoranda in response to comments raised about the use of BIA for the Queen's Flowers Group. This memoranda focused in large measure on the failure of the companies to provide requested related party information in their responses to questionnaires. The Final Results state, "... not all of the companies of this group responded to our questionnaire. Further, there exist serious deficiencies in the responses submitted by this group." 61 Fed.Reg. at 42836.

The plaintiffs, Queen's Flowers Group, et. al., argue that the twenty companies were unlawfully collapsed, and that BIA was applied to the companies unlawfully because the companies gave complete responses to the sections of the questionnaires devoted to related party information.

### DISCUSSION

■ To receive the requested injunctive relief, plaintiffs must show, "(1) that [they] will be immediately and irreparably injured; (2) that there is a likelihood of success on the merits; (3) that the public interest would be better served by the relief requested; and (4) that the balance of hardship on all the parties favors the [plaintiffs]." *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (1983); *see also American Air Parcel Forwarding Co. v. United States*, 1 CIT 293, 297–300, 515 F.Supp. 47 (1981).

Chia, Queen's Flowers de Colombia, and Jardines Fredonia.

3. The companies analyzed were: Flores Jayvana, Flores el Cacique, Flores Calima, Flores la Mana, Flores el Cipres, Flores el Roble, Flores de Bojaca, Flores el Tandil, Flores el Aljibe, Flores Atlas, Floranova, and Cultivos Generales.

Preliminarily, the defendant challenges the power of the Court of International Trade to grant injunctive relief reinstating the predecessor cash deposit rate to prevent irreparable harm that might result from an erroneous deposit rate. The court has the power to grant the requested injunctive relief. *See* 28 U.S.C. § 2643(c)(1); *see also* 28 U.S.C. § 1585 ("The Court of International Trade shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States."); *see also Krupp Stahl AG v. United States*, 553 F.Supp. 394, 396 (1982), *Companhia Brasileira Carbureto de Calcio v. United States*, slip op. 94–48, 1994 WL 91951 (1994). To obtain such relief, however, petitioner has an extremely heavy burden, particularly on the question of injury. It is only in the rarest of instances that this form of injunctive relief will be granted. Petitioner has satisfied the burden for eight of the twenty companies.

On the question of irreparable injury, the court analyzes the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief. On the record before the court, plaintiffs have established that under the new cash deposit rate of 76.60 percent, eight of the twenty companies will go out of business within periods ranging from a few days to a few weeks.[4] The eight companies are: Agroindustria del RioFrio; Flores del Halo Ltda.; Flores el Aljibe; Flores la Mana; Flores Canelon Ltda; Flores Calima; Jardines de Chia Ltda.; and Queen's Flowers de Colombia Ltda. These companies sell an extremely high percentage of their production of the subject merchandise to the United States (all around 80%) and these sales account for a similarly high percentage of their total sales revenue.[5] Also, the product they sell is a perishable good tailored to the unique demands of the United States flower market; alternative markets do not exist in which the

4. For example, Jardines de Chia, Flores Calima S.A., and Flores la Mana would all go out of business within two weeks.

5. For example, 98% of Agroindustria del RioFrio's subject flower revenue is from U.S. sales, accounting for 82% of its total sales revenue.

companies can sell their excess capacity to stay in business. The new deposit rate is also very high, relative to the rates set in the prior administrative review, especially in an industry that is so competitive. Thus, collection of the 76.60 deposit rate will force each of the eight companies out of business within an extremely short time period, eliminating their opportunity for future corrective judicial relief.

Five of the companies in question do not produce the subject merchandise and therefore have failed to demonstrate the requisite irreparable harm. The five companies are: Jardines Fredonia; Flores Atlas; Cultivos Generales; Flora nova; and Flores el Roble. These five companies do not produce merchandise covered by the Final Results and therefore cannot demonstrate the immediacy required for a showing of irreparable harm.

The remaining seven companies are: Flores de Bojaca Ltda., Flores el Cacique, Flores el Cipres Ltda., Flores el Tandil Ltda., Flores Jayvana, Flores la Valvanera Ltda, M.G. Consultores Ltda. While the remaining seven companies will be seriously compromised by the new deposit rate, the record indicates that these companies' sales of non-subject merchandise will permit them to survive. They have not established the same level of immediacy of harm that the other eight companies have: immediate extinction. The court does not believe that they have satisfied the showing of irreparable harm that would permit the grant of injunctive relief on the cash deposit rate.

On the merits, plaintiffs challenge ITA's basis for applying BIA, ITA's methodology for collapsing related parties, and the specific application of that methodology to plaintiffs. On plaintiffs' likelihood of success, while the court has not arrived at a final decision as to the propriety of the ITA's actions, at this juncture and on the present record, the court has concluded that plaintiffs likelihood of prevailing on the merits is sufficient on the

issue of ITA's application of BIA.[6] One of the primary deficiencies relied upon by the ITA was the failure of some plaintiffs (comprising the original eight receiving questionnaires) to provide related party information in the form of complete shareholder information for other companies that did not produce the subject merchandise. Plaintiffs pointed out to the court, however, that the first two questionnaires did not request that information. The first section A questionnaire stated, *inter alia*:

> ... Provide the names and addresses of all related companies that *deal with the products involved in this review* ...

(Tab 14, Appendix III of Pl. Motion) (emphasis added). Section A of the supplemental questionnaire dated July 22, 1994, asked, *inter alia*:

> Is any member of your Board of Directors or any stockholder, whether directly or indirectly (through a holding company, subsidiary company or parent company), also a stockholder or member of the Board of Directors of any other producer, reseller, bouquet converter, or U.S. importer *of the subject merchandise?* If so, fully disclose all relationships and give full ownership information for those companies.

(Emphasis added). These early questionnaires demonstrate that the ITA did not request complete shareholder information for companies that did not produce the subject merchandise. And yet, the failure of the original seven companies to provide that information led ITA in part to use BIA against all 20 firms. The problem with ITA's action is that the alleged response deficiency cannot support application of BIA where the information sought was apparently never requested. *See Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1572–75 (Fed.Cir. 1990).

Moreover, it appears that when the ITA specifically requested complete shareholder

6. Because the court believes plaintiffs may prevail on the merits on the issue of the application of BIA, the court need not consider plaintiffs likelihood of success on their challenge to ITA's collapsing methodology and its application to their case; although, the court believes these additional issues raise questions going to the

merits that are "so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953) (*quoted in American Air Parcel Forwarding Co. v. United States,* 1 CIT 293, 298, 515 F.Supp. 47 (1981)).

information about the companies that did not produce the subject merchandise, the information was provided. In correspondence dated, May 26, 1995 addressed to plaintiffs' counsel from the ITA, the ITA specifically asked for the information. (Tab 16, Appendix III Pl. Motion Papers). The producers provided detailed responses which the ITA received on June 13 and June 22 of 1995. (Tabs 17–22, Appendix III Pl. Motion Papers). The May 26, 1995 request came just two weeks before the preliminary results were published on June 8, 1995. The responses were received after that date, but within a reasonable time period given the nature of the information requested. It appears that the ITA had all of plaintiffs related party information by June 22, 1995, fully one year before the issuance of its final results.

There is another telling point about a specific deficiency upon which the ITA relied in using BIA. In its Final Results and BIA analysis memorandum dated June 28, 1996, ITA states that Cultivos Generales failed to respond to the Department's initial questionnaire in the seventh review. At the hearing on the preliminary injunction, it became apparent that the ITA had sent the questionnaire to the wrong address, and that Cultivos Generales had not received it. Application of BIA on the ground that Cultivos did not respond is therefore unmerited.

Generally, the public interest is served by imposing the correct antidumping duties on subject entries. There is also, however, a public interest in meaningful judicial review of unlawful administrative action, particularly in an instance such as this where the potential unlawful application of BIA threatens eight producers with immediate economic extinction. The injunction in favor of the eight producers does not relieve them of their liability to pay dumping duties; it instead insures them an opportunity to litigate what may be a meritorious claim. Accordingly, in this instance the public interest will be served by granting some of the requested relief.

The question of the balance of hardship is particularly difficult. The equities for plaintiffs are manifest. The injunction against the new cash deposit rate will allow the eight producers to avoid immediate economic extinction and pursue potential success on the merits. At the same time, the injunction does not relieve the plaintiffs of their ultimate duty liability. The equities in favor of the defendant arise from the antidumping statute that includes a cash deposit requirement[7] to insure that the government will be paid antidumping duties ultimately owed, and to "insure that complete information will be submitted to the Authority in a timely manner." H.R.Rep. No. 96–317, 96th Cong., 1st Sess. at 69 (1979). Another factor in defendant's favor is plaintiffs' ability to collect any overpayment of deposits of estimated antidumping duties, 19 U.S.C. § 1673f(b)(2) (1994) with interest 19 U.S.C. § 1677g(a) (1994). Also, because of the magnitude of the deposit rate imposed, the defendant claims, accurately, that there is some likelihood the duty ultimately owed may not be paid if the deposits are not collected at the time of importation. This argument deserves serious weight.

The court believes, however, that when balanced, the hardships favor granting the eight producers an injunction against collection of cash deposits at the rate set by the final results (76.60%) conditioned on the posting of a bond in the amount of $1,500,000. The security of the bond serves to limit the defendant's exposure for unpaid duty liabilities for the duration of the injunction. The Court will also direct that the parties attempt to further limit this exposure by accelerating the pace of the litigation.

CONCLUSION

■ The court has considered the balance between the potential harm to the defendant of granting the requested relief, the possibility of irreparable injury to plaintiff were the relief to be denied, and the serious questions of law and fact that have been presented. Under all of the circumstances, the court has concluded that a preliminary injunction should issue as set forth in the accompanying order. The court has circumscribed the re-

7. 19 U.S.C. § 1673e(a)(3).

lief by limiting the scope of the injunction affecting the cash deposit rates to the eight companies that established a risk of immediate economic harm, by conditioning the injunction on plaintiffs giving security of $1,500,000, and by directing that the pace of litigation be accelerated.

Accordingly, upon consideration of plaintiffs' application for a preliminary injunction, defendant's memorandum in partial opposition to the application, and other pertinent papers, and after a hearing at which both parties were heard, it is hereby

ORDERED that the part of the application which seeks to enjoin liquidation of entries of fresh cut flowers from Colombia which are the subject of the administrative determination *Certain Fresh Cut Flowers from Colombia,* 61 Fed.Reg. 42833 (Aug. 19, 1996) (final results admin. reviews), which covers the periods March 1, 1991 through February 29, 1992; March 1, 1992 through February 28, 1993; March 1, 1993 through February 28, 1994; is hereby granted; and it is further

ORDERED that the United States, together with the officers, agents, and employees of the United States Customs Service, shall be, and hereby are, enjoined from liquidating entries of fresh cut flowers from Colombia that

A. are the subject of the above referenced determination;
B. were produced by the following companies:
   1. Agroindustria del RioFrio Ltda.,
   2. Cultivos Generales Ltda.,
   3. Floranova Ltda.,
   4. Flores Atlas Ltda.,
   5. Flores Calima S.A.,
   6. Flores de Bojaca Ltda.,
   7. Flores del Halo Ltda.,
   8. Flores el Aljibe S.A.,
   9. Flores el Cacique Ltda.,
   10. Flores Canelon Ltda.,
   11. Flores el Cipres Ltda.,
   12. Flores el Roble,
   13. Flores el Tandil Ltda.,
   14. Flores Jayvana Ltda.,
   15. Flores la Mana S.A.,
   16. Flores la Valvanera Ltda.,
   17. Jardines de Chia Ltda,
   18. Jardines Fredonia Ltda,
   19. M.G. Consultores Ltda.,
   20. Queens Flowers de Colombia Ltda.;
C. were entered, or withdrawn from warehouse, for consumption during the period March 1, 1991 through February 28, 1994;
D. were imported by Queen's Flowers Corp., Atlas Flowers, Inc. d/b/a Golden Flowers, and/or Florexpo;
E. remain unliquidated as of 5 o'clock p.m. on the first business day after the day on which copies of this order are personally served by plaintiffs upon the following individuals and received by them or their delegates:

Laurie Parkhill, Director, Office 3, Import Administration, Room 3099, United States Department of Commerce, 14th Street and Constitution Avenue, N.W., Washington D.C.; and

Hon. George J. Weise, Commissioner of Customs, Attn: Elizabeth Anderson, Chief Counsel, United States Customs Service, Room 3305, 1301 Constitution Avenue, N.W., Washington, D.C.;

and it is further

ORDERED that defendant, the United States, together with the officers, agents, and employees of the United States Customs Service, shall be, and hereby are, enjoined from requiring the payment of, or otherwise collecting, antidumping duty deposits on any entries of fresh cut flowers subject to the antidumping duty order covering certain fresh cut flowers from Colombia, produced or imported by the following companies of the "Queen's Flowers Group" as listed in the Department of Commerce's August 1996 Notice of Final Results of Antidumping Duty Administrative Reviews Concerning Certain Fresh Cut Flowers From Colombia, at rates

other than those indicated below, which rates are those in effect under the last completed administrative review, 59 Fed.Reg. 15159 (Mar. 31, 1994):

| | |
|---|---|
| Agroindustria del RioFrio Ltda. | 3.13 percent |
| Flores del Halo Ltda. | 3.10 percent (all others rate) |
| Flores el Aljibe S.A. | 3.10 percent (all others rate) |
| Flores la Mana S.A. | 3.10 percent (all others rate) |
| Flores Canelon Ltda. | 3.10 percent (all others rate) |
| Flores Calima S.A. | 3.10 percent (all others rate) |
| Jardines de Chia Ltda. | 0.00 percent |
| Queen's Flowers de Colombia Ltda. | 0.00 percent |

---

ORDERED that within ten days from the date of this Order the three importers of the fresh cut flowers produced by the above named Columbian companies will give security or a bond in the amount of one and a half million ($1,500,000.00) dollars in order to indemnify the United States for any costs and damages it may suffer as the result of the preliminary injunction, and it is further

ORDERED that the parties are directed to accelerate the pace of the litigation, and it is further

ORDERED that the joint status report and proposed briefing schedule for this matter shall be filed with the court by Friday, September 13, 1996, and it is further

ORDERED that the Temporary Restraining Order dated August 19, 1996, is hereby vacated, and it is further,

ORDERED that plaintiffs' application is denied in all other respects.