**QUEEN'S FLOWERS DE COLOMBIA, et al., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Floral Trade Council, Defendant–Intervener.**

Slip Op. 97–120.
Court No. 96–08–01921.

United States Court of International Trade.

Aug. 25, 1997.

Arnold & Porter, (Micheal T. Shor, William L. Busis), Washington, DC, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Velta Melnbrencis, Assistant Director, (Karen L. Bland, Jeffrey C. Lowe and Sanjay L. Mullick), Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Lucius B. Lau, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

Stewart and Stewart, (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer, Mara M. Burr) for Defendant–Intervener.

## OPINION

POGUE, Judge.

This matter is before the court on the motion of plaintiffs, 20 individual privately-held producers and exporters of fresh cut flowers from Colombia, and three related importers in the United States, for judgment on the agency record, pursuant to U.S. CIT Rule 56.2. Plaintiffs challenge certain aspects of the Department of Commerce's ("Department" or "Commerce") final results of antidumping administrative reviews in *Certain Fresh Cut Flowers from Colombia*, 61 Fed.Reg. 42,833 (Dep't. Commerce 1996)(final results admin. reviews).

The 20 producers/exporters consist of the following Colombian companies: (1) Queen's Flowers de Colombia Ltda., (2) M.G. Consultores Ltda., (3) Agroindustria del RioFrio Ltda., (4) Cultivos Generales Ltda., (5) Floranova Ltda., (6) Flores Atlas Ltda., (7) Flores Calima S.A., (8) Flores de Bojaca Ltda., (9) Flores del Hato Ltda., (10) Flores el Aljibe S.A., (11) Flores el Cacique Ltda., (12) Flores Canelon Ltda., (13) Flores el Cipres Ltda., (14) Flores el Roble, (15) Flores el Tandil Ltda., (16) Flores Jayvana Ltda., (17) Flores la Mana S.A., (18) Flores la Valvanera Ltda., (19) Jardines de Chia Ltda., and (20) Jardines Fredonia Ltda.

The three U.S. importers are: (1) Queen's Flowers Corp., based in Miami, Florida, (2) Atlas Flowers, Inc. d/b/a/Golden Flowers, located in Miami, Florida, and (3) Florexpo, located in Carlsbad, California.

In its Final Results for the consolidated fifth, sixth and seventh administrative reviews of the antidumping order on *Certain Fresh–Cut Flowers From Colombia*, 61 Fed. Reg. 42,833, the Department of Commerce International Trade Administration ("ITA") determined that all 20 flower-producing companies were related, and collapsed them into a single entity called the "Queen's Flowers Group." ITA did not base the dumping margins for this group on data submitted by the companies. Instead, ITA applied a best information available rate ("BIA") of 76.60 percent to all 20 companies for each of the three one-year periods of review, and for future cash deposits. The margins found for other Colombian producers were in the range of 0 to 5 percent.

## BACKGROUND

Following investigations by the Department of Commerce and the U.S. International Trade Commission, an antidumping duty order was entered against Certain Fresh Cut Flowers From Colombia in 1987. That antidumping duty order covered standard carnations, miniature carnations, standard chrysanthemums, and pompom chrysanthemums. *See Certain Fresh Cut Flowers From Colombia*, 52 Fed.Reg. 6492 (Mar. 18, 1987) (amend. final determ.).

Prior to the August 19, 1996 publication of the final results in the consolidated fifth, sixth, and seventh administrative reviews of the *Fresh Cut Flowers From Colombia* antidumping duty order, covering entries made between March 1, 1991 and February 28, 1994, plaintiffs' exports to the United States were subject to antidumping duty deposit rates ranging between 0% and 3.13%.

Nine of the twenty plaintiff producers were included within Commerce's Notices of Initiation for the fifth, sixth, or seventh administrative reviews, which initiated administrative reviews for several hundred Colombian producers/exporters of subject merchandise. These nine companies were: (1) Queen's Flowers de Colombia Ltda., (2) Jardines de Chia Ltda., (3) Jardines Fredonia Ltda., (4) Agroindustria del RioFrio Ltda., (5) Flores Canelon Ltda., (6) Flores del Hato Ltda., (7) Flores la Valvanera Ltda., (8) M.G. Consultores Ltda., and (9) Cultivos Generales Ltda. (previously Flores Generales). Cultivos Generales and Fredonia, however, certified that they did not produce or export subject merchandise to the United States during the periods of review. No review was requested for the remaining 11 companies, and thus none were included in any of ITA's three notices of initiation.[1]

---

**1.** Queens Flowers argues that since no review was requested for 11 of the producer plaintiffs, and since these 11 were not included in ITA's notice of initiation, these 11 producers were im-

In the preliminary results issued on June 8, 1995, ITA determined to collapse eight of the original producer plaintiffs into one entity, the Queens's Flower Group. All of the plaintiff producers in Commerce's Notices of Initiation were included except Cultivos Generales. Although all the companies provided responses to ITA's initial questionnaire and supplemental questionnaires, ITA preliminarily determined that these respondents had impeded its investigation, and applied a first-tier best information available ("BIA") rate to the eight companies. First-tier BIA is the most adverse BIA level and is applied to companies that refuse to cooperate with Commerce's requests for information or significantly impede an administrative review. *See Allied–Signal Aerospace Co. v. United States*, 996 F.2d 1185 (Fed.Cir.1993). This rate, equal to the highest rate ever determined for any producer in any review, was 75.92 percent for the fifth administrative review period, and 83.61 percent for the sixth and seventh administrative review periods. *Certain Fresh Cut Flowers From Colombia*, 60 Fed.Reg. 30270, 30272–73 (Dep't.Commerce, 1995) (prelim. results admin. review).

Previously, Commerce had delivered a November 17, 1994, decision memorandum to the eight companies explaining why the companies were collapsed, and a December 5, 1994, analysis memorandum itemizing deficiencies in their questionnaire responses which, according to Commerce, justified the use of BIA.

On May 26, 1995, ITA issued Section A questionnaires covering all three review periods to the 12 producer plaintiffs not covered in the preliminary determination. It issued supplemental questionnaires to these companies on July 21, 1995. Timely responses were provided by all companies. On August 3, 1995 the ITA issued a decision memorandum analyzing the relatedness of the original eight parties. That memorandum determined that the companies were related. On February 1, 1996, the ITA issued a memorandum analyzing the relatedness of the twelve other companies [2] to the earlier eight. That memorandum determined that all twenty companies were related.

On June 28, 1996, the ITA issued a memorandum in response to comments raised about the use of BIA for the Queen's Flowers Group. This memorandum focused in large measure on the failure of the companies to provide related party information in their responses to questionnaires.

The Plaintiffs, Queen's Flowers Group, et. al., argue that the twenty companies were unlawfully collapsed, and that BIA was applied to the companies unlawfully because the companies gave complete responses to the questionnaires.

properly included within the scope of these administrative reviews. The Court does not agree. In *UCF America Inc. v. United States*, 870 F.Supp. 1120 (CIT 1994), Commerce included in an administrative review Chinese exporters for whom no review had been requested and who had not been included in Commerce's notice of initiation. The court found that "the statute imposes no burden on Commerce with regard to the form of Commerce's response to requests for annual reviews, other than the requirement that Commerce publish a notice in the Federal Register announcing that a review will be undertaken." *Id.* at 1125. Furthermore, the court found that the domestic producer that requested the review had complied with the applicable regulation and with the "spirit" of the statute in enumerating specific companies for review. Finally, the court said that since the contested companies received questionnaires prior to the Preliminary Results, allowing Commerce to clarify the scope of review in the Preliminary Results, the contested companies had adequate notice that they would be included in the administrative review. *Id.* at 1126. Similarly, in this case, Commerce sent Section A questionnaires to the additional 11 respondents prior to publication of the preliminary results and explained in the Preliminary Results that "we believe that there are an additional 12 companies with strong ties to the Queen's Flowers Group. We are giving these 12 companies an opportunity to respond to our questionnaire.... If ... we conclude that any or all of these companies are significantly related to the Queen's Flowers Group to be considered to be one entity, the rates for the group will apply to these companies as well." *Certain Fresh Cut Flowers From Colombia*, 60 Fed.Reg. 30,270, 30,273 (Dep't. Commerce 1995). Because all parties had sufficient notice and an opportunity to respond, the Court concludes that the contested parties were appropriately included within the scope of Commerce's investigation.

**2.** The companies analyzed were: Flores Jayvana, Flores el Cacique, Flores Calima, Flores la Mana, Flores el Cipres, Flores el Roble, Flores del Bojaca, Flores el Tandil, Flores el Aljibe, Flores Atlas, Floranova, and Cultivos Generales.

## DISCUSSION

### I. Collapsing Parties

Plaintiffs argue that Commerce does not have the legal authority to collapse 20 companies and treat them as a single entity. (Pls.' Br. Supp. Rule 56.2 Mot. J. Agency R. [hereinafter Pls.' Brief] at 21). Specifically, Plaintiffs argue, ITA has no statutory. authority to collapse multiple producers or exporters.

■■■ "If the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Commerce acknowledges that "[i]t is the Department's long standing practice to calculate a separate dumping margin for each manufacturer or exporter investigated." Final Results, 61 Fed.Reg. at 42,853. However, the statute itself does not require that Commerce calculate company-specific margins, *see Certain Granite Products from Italy,* 53 Fed.Reg. 27,187, 27,189 (Dep't. Commerce 1988)(final determ.); nor does it contain a standard for Commerce to apply in determining what constitutes a "company" for purposes of the antidumping law. In this case Commerce's decision to define "company" to include several closely related companies is a permissible application of the statute. Commerce treats closely related parties as a single entity in order to "ensure that [Commerce] reviews the entire producer or reseller, not merely a part of it." Final Results at 42,853. Commerce's authority to ignore the separate legal existence of some parties for purposes of calculating dumping margins arises out of the "basic purpose of the statute—determining current margins as accurately as possible," *Rhone Poulenc, Inc. v. United States,* 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990), as well as the Department's responsibility to prevent circumvention of the antidumping law. *See Mitsubishi Electric Corp. v. United States,* 12 CIT 1025, 1046, 700 F.Supp. 538, 555 (1988) ("The ITA has been vested with authority to administer the antidumping laws in accordance with the legisla-

tive intent. To this end, the ITA has a certain amount of discretion [to act] ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."), *aff'd* 8 Fed. Cir. (T) 45, 898 F.2d 1577 (1990).

The statute contains ˅several provisions that permit or require Commerce to ignore transactions between related buyers and sellers in the home market or to treat a related exporter and importer as a single entity in order to prevent price or production manipulation. *See, e.g.,* 19 U.S.C. § 1677b(c) (1988) (permitting Commerce to ignore transactions in a nonmarket economy country (a country that does not operate on market principles of cost or pricing structures) and calculate a single foreign market value for all producers or exporters), 1677b(e) (1988) ("For the purposes of [calculating constructed value] a transaction directly or indirectly between [related parties] may be disregarded ...."); *see also NACCO Materials Handling Group Inc. v. United States,* 971 F.Supp. 586 (CIT 1997)(finding Commerce's decision to treat an exporter, its related United States importer and a wholly owned subsidiary of the importer as a single entity in calculating United States Price, pursuant to 19 U.S.C. § 1677(13)(c) to be in accordance with law.).

This court has twice implicitly endorsed Commerce's authority to collapse related foreign producers in appropriate circumstances. In *FAG Kugelfischer v. United States,* 932 F.Supp. 315 (CIT 1996), the court listed the factors to be considered by Commerce when deciding whether companies should be collapsed. Ultimately the court overturned Commerce's decision to collapse based on its finding that Commerce had not adequately considered all of the factors. *Id.* at 324. Similarly, in *Nihon Cement Co., Ltd. v. United States,* 17 CIT 400, 1993 WL 185208 (1993), the court overturned Commerce's collapsing determination because Commerce's determination failed to include any discussion or evidence regarding the collapsing criteria. "While each of [the] criteria did not have to be met, Commerce did have to consider them all." *Id.* at 426. In neither case did the court question Commerce's authority to col-

lapse parties if the collapsing criteria were met.

## II. Commerce's Use of § 1677(13) to Define Related Parties

■ "In prior cases involving collapsing, the Department has stated that it will only collapse parties that are related to each other.... In recent proceedings, the Department has refined this practice by noting that it only collapses parties that are related within the meaning of Section 771(13) of the Tariff Act [19 U.S.C. § 1677(13) ]." (Mem. from Michael F. Panfeld to Holly A. Kuga, Aug. 3, 1995 (citing *Fresh Cut Roses from Ecuador,* 60 Fed.Reg. 7019, 7040 (Dep't. Commerce 1995)(fin.determ.); *Disposable Pocket Lighters from Thailand,* 60 Fed.Reg. 14,263, 14,268 (Dep't. Commerce 1995)(fin. determ. and fin. negative critical circumstances determ.))).

Section 1677(13) provides as follows:

For the purpose of determining United States price, the term "exporter" includes the person by whom or for whose account the merchandise is imported into the United States if—

(A) such person is the agent or principal of the exporter, manufacturer, or producer;

(B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;

(C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or

(D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

19 U.S.C. § 1677(13) (1988). Plaintiffs argue that Commerce should have used the related party definition found at 19 U.S.C. § 1677b(e)(4). This definition applies when Commerce is calculating constructed value.[3] Section 1677b(e) requires that under specified circumstances Commerce is to ignore transactions involving inputs to the manufacture of the subject merchandise when the transactions are between related parties. *See* 19 U.S.C. § 1677b(e)(2) & (3) (1988). The term "related parties" is defined to include:

(A) Members of a family, including brothers and sisters ..., spouse, ancestors, and lineal descendants.

(B) Any officer or director of an organization and such organization.

(C) Partners.

(D) Employer and employee.

(E) Any person directly or indirectly owning, controlling or holding with power to vote 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

19 U.S.C. § 1677b(e)(4) (1988). Plaintiffs argue that this related-party definition is more restrictive and therefore more appropriate in identifying situations " 'where the type and degree of relationship is *so significant* that ... there is a *strong* possibility of price manipulation.' " (Pls.' Br. at 35 (quoting *Nihon Cement,* 17 CIT at 425)).

However, the definition relied on by Commerce in this case is the more generally applicable of the two related party definitions. Section 1677(13) is used by Commerce to define the identity of the exporter when calculating United States price.[4] The section

---

**3.** Normally foreign market value is based on sales in the producer's home country, or a third country. However, if home and third-country market sales are found to be inadequate for determining foreign market value, Commerce bases foreign market value on the constructed value of the subject merchandise. 19 U.S.C. § 1677b(a)(1) and (2) (1988).

**4.** Specifically, Section 1677(13) is used to determine whether the importer in the United States

is also used to determine whether home market sales are between related companies for purposes of calculating foreign market value. *See* 19 U.S.C. § 1677b(a)(3) (1988) ("If such or similar merchandise is sold . . . through a sales agency or other organization related to the seller in any of the respects described in section 1677(13) of this title, the prices at which such or similar merchandise is sold . . . by such sales agency . . . may be used in determining the foreign market value."). Finally, under 19 C.F.R. § 353.45(a), Commerce is required to disregard sales of subject merchandise between related parties, as defined under section 1677(13), unless Commerce is satisfied that the sales were made at arm's length. *See Ansaldo Componenti S.p.A. v. United States,* 10 CIT 28, 35, 628 F.Supp. 198, 204 (1986) ("ITA has relied on § 1677(13) to determine whether companies in the home market are related parties in choosing whether to rely on home market sales to calculate FMV.").

The related party definition found at section 1677b(e)(4), on the other hand, applies only when the agency is using constructed value to calculate FMV, and only to transactions involving inputs to the production process in the computation of constructed value.

The statute does not include a provision for collapsing related producer/exporters; therefore, it also does not mandate a particular definition of related parties to be used in making a collapsing determination. In the absence of such a provision, Commerce's decision to rely on section 1677(13), the more generally applicable related parties definition, was a reasonable interpretation of the statute. "In a situation where Congress has not provided clear guidance on an issue, *Chevron* requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable." *Koyo Seiko Co., Ltd. v. United States,* 36 F.3d 1565, 1573 (Fed.Cir.1994).

Plaintiffs also argue that the use of Section 1677(13) in this case violated 19 U.S.C.

§ 1677b(e)(2) because Commerce used constructed value as the basis for FMV. Under 19 U.S.C. § 1677b(e)(2), Commerce may ignore intercompany transactions only if the companies are related as this term is defined in section 1677b(e)(4). By collapsing parties related according to the definition in section 1677(13), Plaintiffs argue, Commerce ignored transactions between companies that may not have been related under section 1677b(e)(4). However, Commerce's collapsing analysis and its constructed value calculation are separate. If Plaintiffs believe that Commerce erroneously ignored certain transactions in calculating constructed value they should have cited to record evidence of that error.

### III. Commerce's Determination that the Members of the Queens Flowers Group are Related

Plaintiffs argue that even if Section 1677(13) provides the proper related party test, Commerce's determination that all 20 companies within the Queens flowers group were related was not supported by substantial evidence on the record. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (1988).

■ When examining Commerce's factual determinations to decide whether they are supported by substantial evidence, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951)(*quoted in Matsushita Elec. Indus. Co. v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)).

Commerce's "related parties" analysis divides the group into two subgroups, the A Group and the B Group. *See* Mem. from Michael F. Panfeld to Holly A. Kuga (Feb. 1, 1996). MG Consultores (MG) is the "hub" of

---

is related to the foreign exporter, and whether to use *exporter's sales price* or *purchase price* in calculating United States price. Purchase price, the price paid by the U.S. importer to the foreign exporter or manufacturer is used when the exporter or manufacturer and importer are unre-

lated. *See* 19 U.S.C. § 1677a(b). Exporter's sales price, the price at which the merchandise is sold in the United States to an unrelated purchaser, is used when the exporter and importer are related. *See* 19 U.S.C. § 1677a(c).

the A Group. Def.'s Mem. Opp. Pls.' Mot. J. Agency R. at 42. MG owns at least a 20 percent share of six companies. Commerce defines "any interest" to mean no less than a five-percent ownership interest. Therefore, each of these companies is related to MG according to section 771(13)(B). Furthermore, the companies are related to each other according to the terms of 771(13)(D).

Mr. "X" owns 25 percent of MG. Mr. X also owns 33 percent of Company "Z", so MG and Company Z are related under 771(13)(D), and Mr. X owns 10 percent of Company "Y", so Mr. X and Company Y are related pursuant to 771(13)(B). However, according to the terms of Section 1677(13), Company Z and Company Y are not related to the remaining members of the subgroup. None of the other subgroup members have any ownership interest in either Z or Y, and Z and Y have no ownership interest in any of the other A Group members. Furthermore, there is no person or persons who owns directly or indirectly at least 20 percent of both Z or Y and the other members of the A Group. Mr. X's indirect ownership interests in the other A Group companies, through his interest in MG Consultores, are less than 20 percent.

Defendant argues that the fact that MG Consultores is related to its subsidiaries and that Company Z is related to MG Consultores provides a legal basis to conclude that Z is related to MG Consultores' subsidiaries. "The rationale is simple," Defendant explains, "MG Consultores and its subsidiaries had a parent-subsidiary relationship. As such, they were collapsed and treated as a single enterprise for purposes of establishing their entire relationship with other parties under section 771(13)." Def.'s Mem. Opp'n Plts.' Mot. J. Agency R. at 45. However, Commerce never made this argument on the record. "The courts may not accept ... counsel's post hoc rationalizations for agency action; ... an agency's discretionary order [must] be upheld, if at all, on the same basis articulated in the order by the agency itself. . . ." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239,

246, 9 L.Ed.2d 207 (1962). Finally, Commerce did not explain its determination that Company Y, which was not related to MG Consultores,[5] was related to the remaining members of the A group.

Commerce also argues that non-financial factors support its finding that Company Z was related to the other members of the A Group. This argument is inconsistent with Commerce's Final Determination in *Fresh Cut Roses from Ecuador,* 60 Fed.Reg. 7019, 7040 (Dep't. Commerce 1995) (final determ.). In that case, Commerce refused to collapse parties, explaining,

> Petitioner's arguments concerning interlocking shareholders, shifting of production, possibility of price manipulation, and control of production and sales, are inapposite because they are related to factors that the Department considers in determining whether to collapse companies for the purpose of calculating a single dumping margin. . . . Significantly, however, a collapsing analysis is only done on related parties ... In most cases, the relatedness of the parties is quite clear, i.e., a parent and a subsidiary, or two sister subsidiaries ... In contrast, in this investigation there is no evidence that, pursuant to the definition of related parties under section 771(13) of the Act, respondent and company X are related. As a result, we have not performed a collapsing analysis.

*Id.; see also Disposable Pocket Lighters from Thailand,* 60 Fed. Reg. 14,263 (Dep't. Commerce 1995)(final determ. and final neg. critical circumstances determ.)(refusing to collapse two parties because one had no ownership interest in the other and therefore the two were not related under section 771(13)).

It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure. . . . This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of a statute." *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075 (1988); *see also Hussey Cop-*

---

5. Mr. X owned only a 10 percent interest in Company Y. Therefore, Company Y was not related to MG Consultores under 19 U.S.C. § 1677(13)(D).

*per, Ltd. v. United States,* 834 F.Supp. 413, 418 (CIT 1993). The rule also assures that an administrative agency will be "faithful and not indifferent to the rule of law," *Columbia Broadcasting System, Inc. v. F.C.C.,* 147 U.S.App. D.C. 175, 183, 454 F.2d 1018, 1026 (1971), and "prohibit[s] the agency from adopting significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical situation.'" *Davila–Bardales v. INS,* 27 F.3d 1, 5 (1st Cir.1994)(quoting *Shaw's Supermarkets, Inc. v. NLRB,* 884 F.2d 34, 37 (1st Cir.1989)). Commerce has the flexibility to change its position providing that it explain the basis for its change [6] and providing that the explanation is in accordance with law and supported by substantial evidence.[7] Commerce gave no explanation for its departure from its position in *Roses* and *Pocket Lighters.* In fact, Commerce did not acknowledge that an inconsistency exists between those cases and the determination here.

Commerce cites *Sugiyama Chain v. United States,* 18 CIT 423, 852 F.Supp. 1103 (1994) for the proposition that "Commerce may properly consider 'both financial and/or non-financial connections' when assessing whether parties are related within the meaning of 19 U.S.C. § 1677(13)(C)." *Id.* at 433, 852 F.Supp. at 1112 (quoting *E.I. DuPont de Nemours & Co. v. United States,* 17 CIT 1266, 1280, 841 F.Supp. 1237, 1248 (1993)). However those cases were decided prior to the *Roses* and *Pocket Lighters* determinations and therefore cannot explain Com-

merce's departure from prior agency practice.

The second subgroup, the B Group is comprised of 14 individual companies. Commerce based its relatedness determination for this group primarily on the ownership interests of Shareholder "J" and his brother. Shareholder J owns more than 20 percent of 12 of these companies. Therefore these 12 companies are related pursuant to 771(13)(D). The brother owns at least 20 percent of three companies, so these three are related to one another pursuant to 771(13)(D). Furthermore, Commerce's finding that these three were related to the other B Group companies was reasonable. The statute requires that "any person or persons" own or control, "jointly or severally, directly or indirectly, ... 20 percent or more of the voting power or control in the business of each party." Commerce's decision to aggregate the interests of two brothers, both producing the same product, with common interests in several businesses, was a reasonable application of the statute. *See Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) ("When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reason-

---

6. "The underlying ground of that principle is that the reviewing court should be able to understand the basis of the agency's action and so may judge the consistency of that action with the agency's general mandate." *Chennault v. Department of Navy,* 796 F.2d 465, 467 (Fed.Cir.1986). "This is not to say that an agency, once it has announced a precedent, must forever hew to it. Experience is often the best teacher, and agencies retain a substantial measure of freedom to refine, reformulate, and even reverse their precedents in the light of new insights and changed circumstances. However, the law demands a certain orderliness. If an administrative agency decides to depart significantly from its own precedent, it must confront the issue squarely and explain why the departure is reasonable." *Davila–Bardales,* 27 F.3d at 5.

7. The court's review of an agency's change of position or practice will typically center on

whether the action was arbitrary. A change is arbitrary if the factual findings underlying the reason for change are not supported by substantial evidence. Apart from factual findings, agency arbitrariness may also manifest itself in the particular reasoning offered by the agency; principally, if the reasoning is inconsistent with the statutory mandate, or, to a lesser extent, if the reasoning (or lack thereof) violates general principles of administrative law, *see, e.g., Hussey Copper, Ltd. v. United States,* 17 CIT 993, 997, 834 F.Supp. 413, 418 (1993) or offends standards of procedural fairness implied in the statute. *See, e.g., Hussey Copper, Ltd. v. United States,* 18 CIT 454, 457–458, 852 F.Supp. 1116, 1120 (1994); *Shikoku Chem. Corp. v. United States,* 16 CIT 382, 388, 795 F.Supp. 417, 421–422 (1992). In this context the court reviews an agency change of position or practice to insure it is "in accordance with law."

able one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.").

After deciding that the members of each sub-group were related, Commerce collapsed each sub-group into a single entity and then decided that each sub-group constituted a "person" under Commerce regulations, and that the two sub-groups are related within the meaning of 1677(13). (Second Collapsing Memo. at 4–5).

 Commerce's related parties analysis includes both common ownership interests between the two groups and non-financial factors. *See Mem. from Michael F. Panfeld to Holly A. Kuga re: Collapsing Related Parties within the Queen's Flowers Group* (Feb. 1, 1996) [hereinafter *February Mem.*]. However, as the Court explained above, Commerce's analysis of non-financial factors in its related parties analysis is inconsistent with previous agency decisions. "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored. . . ." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233 (1971).

A second flaw in Commerce's analysis is that "Commerce did not identify [on the record] the relevant provisions under section 771(13) supporting the determination that the two subgroups, as legal 'persons' were related." [8] (Def.'s Mem. Opp'n. Pls.' Mot. J. Agency R. at 61). Therefore the Court is remanding this issue to Commerce for reconsideration. The agency must identify which provisions of the statute it relied on in making the related parties determination and

8. In its memorandum to this Court, Commerce argues that "[b]oth subsections (B) and (D) support Commerce's determination." *Def.'s Mem. Opp'n. Pls.' Motion J. Agency R.* at 60–62. This argument is simply a post hoc rationalization by government counsel.

9. The common ownership interests listed by Commerce consist of the following:
 1. Both Mr. X and Shareholder J have ownership interests in four companies.
 2. Shareholder "K" has interests in three companies from the A Group and six companies from the B Group.

"must articulate [a] rational connection between the facts found and the choice made." *Nihon Cement Co. v. United States*, 17 CIT 400, 426 (1993) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)). In other words, Commerce must explain how its factual findings support its determination that the Queens Flowers subgroups were related. [9]

## IV. The Remaining Collapsing Factors

After reconsidering its relatedness determination, Commerce must also reevaluate its analysis of the remaining collapsing factors. The court in *Nihon*, described the collapsing analysis as follows:

> In determining whether to collapse entities, Commerce does not focus solely upon the degree of voting control one company may have over another, but upon a broad analysis of the facts in the case. . . . Other factors relied upon by Commerce in collapsing related companies are that (1) the companies are closely intertwined; (2) transactions take place between the companies; (3) the companies have similar types of production equipment, such that it would be unnecessary to retool either plant's facilities before implementing a decision to restructure either company's manufacturing priorities; and (4) the companies involved are capable, through their sales and production operations, of manipulating prices or affecting production decisions. . . . All of these factors need not be present as long as the parties are sufficiently related to present the possibility of price manipulation.

17 CIT at 425.

 In the Final Determination in this case, Commerce stated,

> 3. Shareholder "L" owns minority shares of two of the overlap companies and several B Group companies.

> The remaining ownership interests listed by Commerce are primarily interests in members of one subgroup or the other and therefore do not support a finding of relatedness between the two subgroups. *See February Mem.* at 5–6 n. 1.

> Until Commerce tells the Court the legal standard on which it is relying to make its related parties determination, the Court cannot evaluate whether Commerce's determination is supported by substantial evidence.

To determine whether companies should be collapsed, the Department makes three inquiries. First, the Department examines whether the companies in question are related.... Second, the Department examines whether the companies in question have similar production facilities, such that retooling would not be required to shift production from one company to another.... Third, the department examines whether there exists other evidence indicating a significant potential for the manipulation of price or production. The types of factors the Department examines include: (1) The level of common ownership; (2) the existence of interlocking officers or directors ...; and (3) the existence of intertwined operations.

61 Fed.Reg. at 42,853 (Cmt.26). Although the factors listed by the Department in the Final Determination are not identical to those listed in *Nihon*, the Department has articulated a reasonable set of inquiries for answering the central question, whether parties are sufficiently related to present the possibility of price manipulation. Therefore, the Court finds Commerce's articulation of collapsing factors in the final determination to be in accordance with law.

However, Commerce appears to have relied on a different set of collapsing factors in its November 17, 1994 Collapsing Memorandum. It is not clear to the Court which set of factors formed the basis of Commerce's collapsing determination. "The orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). Therefore, upon remand, Commerce should explain to the Court which set of factors it is relying on to make its collapsing determination. Only then can the Court review whether Commerce's determination was supported by substantial evidence.

### V. Application of BIA

■ Defendant's BIA determination here was based in part on its determination that the Queen's Flowers companies are related, and on the failure of some members of the group to provide related party information.

Therefore, after reevaluating its related parties determination, Commerce must also reconsider its decision to rely on BIA in calculating the group's dumping margin.

On remand, Commerce should also address the flaws in its BIA analysis identified by the Court in the preliminary injunction. *Queen's Flowers de Colombia v. United States,* 947 F.Supp. 503, 507–08 (1996)

One of the primary deficiencies relied upon by Commerce in its BIA analysis was the failure of the original eight group members to provide complete shareholder information for other companies that did not produce the subject merchandise. Plaintiffs pointed out to the court, however, that the first two questionnaires did not request that information. The first section A questionnaire stated, inter alia:

... Provide the names and addresses of all related companies that *deal with the products involved* in this review ...

(Tab 14, Appendix III of Pl. Motion)(emphasis added). Section A of the supplemental questionnaire dated July 22, 1994, asked, inter alia:

Is any member of your Board of Directors or any stockholder, whether directly or indirectly (through a holding company, subsidiary company or parent company), also a stockholder or member of the Board of Directors of any other producer, reseller, bouquet converter, or U.S. importer *of the subject merchandise?* If so, fully disclose all relationships and give full ownership information for those companies.

(Emphasis added). These early questionnaires demonstrate that the ITA did not request complete shareholder information for companies that did not produce the subject merchandise. And yet, the failure of the original companies to provide that information led ITA in part to use BIA against all 20 firms. The problem with ITA's action is that the alleged response deficiency cannot support application of BIA where the information sought was apparently never requested. *See Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1572–75 (Fed.Cir.1990) ("To avoid the threat of [application of BIA], a submitter need only provide complete an-

swers to the questions presented in an information request.").

Moreover, it appears that when the ITA specifically requested complete shareholder information about the companies that did not produce the subject merchandise, the information was provided. In correspondence dated, May 26, 1995 addressed to plaintiffs' counsel from the ITA, the ITA specifically asked for the information. (Tab 16, Appendix III Pl. Motion Papers). The producers provided detailed responses which the ITA received on June 13 and June 22 of 1995. (Tabs 17–22, Appendix III Pl. Motion Papers). The May 26, 1995 request came just two weeks before the preliminary results were published on June 8, 1995. The responses were received after that date, but within a reasonable time period given the nature of the information requested. It appears that the ITA had all of plaintiffs related party information by June 22, 1995, fully one year before the issuance of its final results.

A second deficiency relied on by ITA in its BIA analysis memorandum dated June 28, 1996, was that Cultivos Generales failed to respond to the Department's initial questionnaire in the seventh review. At the hearing on the preliminary injunction, it became apparent that the ITA had sent the questionnaire to the wrong address, and that Cultivos Generales had not received it. Application of BIA on the ground that Cultivos did not respond is therefore unwarranted.

Finally, some of the deficiencies may have resulted from Commerce's own mistakes. Specifically, the deficiencies in Flores del Hato's response to Commerce's September 6, 1994 supplemental questionnaire may have been caused by the fact that Hato received a questionnaire meant for Agroindustria del RioFrio

Commerce's decision to use first-tier BIA was also not adequately explained on the record. According to the statute, "[i]n making their determinations ... the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c) (1988).

Congress "did not explicitly define what type of information constituted the 'best' information. Hence, because Congress has 'explicitly left a gap for the agency to fill' in determining what constitutes the best information available, the ITA's construction of the statute must be accorded considerable deference." *Allied–Signal Aerospace Co. v. U.S.,* 996 F.2d 1185, 1191 (Fed.Cir.1993). In *Allied–Signal* the court approved a BIA scheme in which the ITA selects first-tier BIA when a respondent refuses to cooperate with its requests for information or significantly impedes the administrative review, and second-tier BIA, which is less adverse, when a respondent substantially cooperates but still fails to provide requested information in a timely manner or in the required form. *Id.* at 1190–91.

Although it approved the ITA's two-tier methodology, the *Allied Signal* court found that ITA's application of its methodology was in error. ITA had applied first-tier BIA to a respondent that failed to respond to sections B, C, or D of Commerce's questionnaire. The court found that the respondent's failure to complete the questionnaire did not constitute a refusal to cooperate. "[The respondent] failed to provide a complete response to the requested information because it was unable to, not because it refused to." *See also Usinor Sacilor v. United States,* 18 CIT 1155, 872 F.Supp. 1000, 1007 (1994) (ordering Commerce to determine whether the insufficiency of respondent's questionnaire response was due to respondent's inability to obtain the information before applying first-tier BIA). Thus, in order to apply first-tier BIA, Commerce must produce substantial evidence that respondents refused to cooperate or significantly impeded its review. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

In the Final Determination here, Commerce stated "that the Queen's Flowers Group impeded our investigation and [we] consider the group to be uncooperative. Therefore, we are assigning the Queen's Flowers Group a first-tier BIA...." Final Deter. at 42,855. While Commerce provided

the Court with a list of deficiencies in the Queens Flowers Group members' questionnaire responses, Commerce did not identify for the Court the evidence that the deficiencies were due to a refusal to cooperate. The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System*, 419 U.S. 281, 286, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). However, "the agency must examine the relevant data and articulate a satisfactory explanation for its action...." *Motor Vehicle Manuf. Ass'n. of U.S. v. State Farm Mutual Auto. Ins. Comp.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Upon remand, Commerce must reconsider its choice of BIA and explain to the Court the findings supporting its decision.

## CONCLUSION

In accordance with the foregoing, it is hereby **ORDERED** that Commerce's Final Results of its Administrative Review is remanded for Commerce to reconsider its determination that the 20 Queens Flowers companies are related parties. In light of its reconsideration, Commerce should also reconsider its decision to collapse all 20 companies into a single entity for purposes of calculating a dumping margin, and both the decision to resort to BIA and the use of first-tier BIA in calculating Plaintiffs' dumping margin. Commerce shall complete its remand determination by **November 4, 1997.** Any comments or responses are due by **January 13, 1998.** Any rebuttal comments are due by **January 28, 1998.**[10]

---

**10.** The parties filed extensive briefs in this matter. Accordingly, Plaintiffs' motion for oral argument is hereby denied.