Slip Op. 04-51

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| KAIYUAN GROUP CORP., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Consol. Court No.: 02-00573 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | **PUBLIC VERSION** |
| | : | |
| and | : | |
| | : | |
| PENCIL SECTION WRITING | : | |
| INSTRUMENT MANUFACTURERS | : | |
| ASS'N, et al., | : | |
| | : | |
| Defendant-Intervenors. | : | |

[Plaintiff Kaiyuan Group Corp.'s Motion for Judgment On the Agency Record is denied; Plaintiffs China First Pencil's Motion for Judgment on the Agency Record Pursuant to Rule 56.2 is granted in part and denied in part; and the United States Department of Commerce's Final Results are remanded]

Dated: May 14, 2004

DeKieffer & Horgan, (James Kevin Horgan and Wakako Takatori) for Plaintiff Kaiyuan Group Corporation.

Lafave & Sailer LLP, (Francis J. Sailer) for Plaintiffs China First Pencil Co., Ltd., et al.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Ada E. Bosque, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Philip J. Curtin, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Counsel, for Defendant United States.

Neville Peterson LLP, (George W. Thompson) for Defendant-Intervenors.

**OPINION**

**WALLACH, Judge:**

## I
## Introduction

This matter comes before the court on Plaintiff Kaiyuan Group Corp.'s ("Kaiyuan") Motion for Judgment Upon the Agency Record ("Kaiyuan's Motion"), and Plaintiffs', China First Pencil Co. ("China First"), Guangdong Provincial Stationary & Sporting Goods Import & Export Corp. ("Guangdong"), Orient International Holding Shanghai Foreign Trade Co., Ltd. ("SFTC"), and Three Star Stationary Industry Co., Ltd. ("Three Star"), (collectively, "Plaintiffs China First"), Motion for Judgment on the Agency Record Pursuant to USCIT R. 56.2 ("China First's Motion"). Plaintiffs challenge certain aspects of the United States Department of Commerce's ("Commerce") decision in Certain Cased Pencils from the People's Republic of China; Final Results and Partial Rescission of Antidumping Duty Administrative Review, 67 Fed. Reg. 48,612 (July 25, 2002) ("Final Results"), as amended in Notice of Amended Final Results and Partial Rescission of Antidumping Duty Administrative Review: Certain Cased Pencils from the People's Republic of China, 67 Fed. Reg. 59,049 (Sept. 19, 2002) ("Amended Final Results"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1999). For the reasons set forth below, Kaiyuan's Motion is denied; China First's Motion is granted in part and denied in part; and Commerce's Final Results are remanded for action consistent with this opinion.

## II
## Background

In 1994, Commerce published an antidumping order for certain cased pencils from the People's Republic of China ("PRC"). Antidumping Duty Order: Certain Cased Pencils from the

People's Republic of China, 59 Fed. Reg. 66,909 (Dec. 28, 1994) ("Antidumping Order"). On

December 20, 2000, Commerce published a notice of opportunity to request an administrative

review of certain cased pencils sold during the period of review ("POR"), December 1, 1999,

through November 30, 2000, from the PRC.[1] Antidumping or Countervailing Duty Order,

Finding, or Suspended Investigation; Opportunity to Request Administrative Review and

Request for Revocation in Part, 65 Fed. Reg. 79,802 (Dec. 20, 2002). Commerce received

requests for administrative review from Kaiyuan, Plaintiffs China First, and the Defendant-

Intervenors.[2] On January 31, 2001, Commerce published a notice initiating the review. Initiation

of Antidumping and Countervailing Duty Administrative Reviews, 66 Fed. Reg. 8,378 (Jan. 31,

2001).

Commerce published its notice of preliminary results and partial rescission of the 1999-

2000 review on January 17, 2002. Certain Cased Pencils From the People's Republic of China;

Preliminary Results and Rescission in Part of Antidumping Administrative Review, 67 Fed. Reg.

2,402. (Jan. 17, 2002) ("Preliminary Results"). In the Preliminary Results, the review was

partially rescinded as to Guangdong and Three Star "because they made no shipments of the

_____

[1] The scope of the administrative review covered "certain cased pencils of any shape or dimension which are writing and/or drawing instruments that feature cores of graphite or other materials, encased in wood and/or man-made materials, whether or not decorated and whether or not tipped . . . in any fashion, and either sharpened or unsharpened." Certain Cased Pencils From the People's Republic of China; Preliminary Results and Rescission in Part of Antidumping Administrative Review, 67 Fed. Reg. 2,402, 2,403 (Jan. 17, 2002). The cores of a black lead pencils are composed of graphite, clay, wax, and other ingredients. See Kaiyuan's Motion at 3. The particular combination of these materials determines the core's hardness. Id.

[2] The Defendant-Intervenors are the Writing Instrument Manufacturers Association, Inc., Pencil Section ("WIMA"); Sanford Corp.; Dixon-Ticonderoga Corp.; Aakron Rule, Inc.; General Pencil Co.; Moon Products Inc.; Tennessee Pencil Co.; and Musgrave Pencil Co.

subject merchandise to the United States during the POR." Id. at 2,403. China First, Kaiyuan and SFTC actively participated in the review. Id. Guangdong and Three Star stated that they did not export the subject merchandise during the POR. Id.

**A**
**Commerce's Investigation and the Parties' Questionnaire Responses**

**1**
**China First Pencil and Three Star**

On February 12, 2001, Commerce issued antidumping questionnaires. China First indicated in its questionnaire response of April 11, 2001, that it was "a shareholding company listed on the Shanghai Stock exchange . . . owned by its approximately 25,000 shareholders . . . [and that m]ore that 47 percent of [its] shares were held by foreign (non-Chinese) shareholders." China First's Motion at 4. China First stated that one of its shareholders, Shanghai Light Industry Group Co., Ltd. ("SLI"), had administrative responsibility for the protection of Three Star's state-owned assets. China First also stated that while it was under the oversight of SLI, it was neither affiliated with Three Star nor did it coordinate prices, suppliers, customers or business operations with Three Star.

On May 8, 2001, Defendant-Intervenors provided Commerce with information regarding the relationship between Three Star and China First Pencil. Defendant-Intervenors stated that "[the documents included in the Joint Submission demonstrate that China First was provided wide-ranging, substantive oversight of Three Star by SLI, the common owner of both; there is nothing indirect or advisory about China First's role.]"[3] Letter from Defendant-Intervenors to

_____

[3] Previously, during the 1998-1999 review, Defendant-Intervenors had urged Commerce to determine that Three Star was no longer a separate producer, but had become a single entity with China First. Although Commerce did not agree, it stated that it would "revisit this issue if

4

Commerce (May 8, 2001), Defendant's Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Opposition"), Appendix 2 at 8.

On May 18, 2001, Commerce inquired in a supplemental questionnaire about the oversight functions of SLI as a state assets company. In its June 11, 2001, response to the supplemental questions, China First provided a copy of its 2000 annual report including its 1999 and 2000 audited financial statements. This audited report described the state-owned assets company SLI as an "affiliated party" and referred to Three Star, though not by name, as "an affiliate of SLI," but did not indicate that China First had any connection with Three Star. China First's Motion at 5. China First said it had a contractual arrangement with SLI to provide administrative guidance to Three Star relating to sanitation and environmental management issues, production safety measures, and oversight of Three Star's yearbook. China First's Motion at 5. Plaintiffs claimed that SLI "review[ed] the financial statements of its 'subsidiary' companies, owned by 'All the People' to ensure that independent company management is responsibly managing the businesses." Id. at 5-6

During January and February of 2002, as part of its antidumping investigation, Commerce conducted verifications of China First and Three Star. After verification of China First's balance sheet and investments ledgers, Commerce stated that "[w]e noted no investment which might indicate unreported [China First Pencil] affiliates, associates or subsidiaries." Id. at 7. After the verification of Three Star, Commerce stated that "[w]e noted no investment by Three Star in

---

additional evidence regarding [China First's] and Three Star's relationship is presented in a future review." Issues and Decision Memorandum from The People's Repiblic of China; Final Results and Partial Recission of Antidumping Duty Administrative Review, 66 Fed. Reg. 37,638 (July 19, 2001), Comment 2.

[China First Pencil].” Id. at 8.

In addition to its responses regarding its business structure, China First submitted surrogate value information for several raw materials, including pencil cores, on March 1, 2002. China First included a price list from an Indian producer of black and colored pencil leads. In its Preliminary Results, Commerce determined the values of cores using Indian tariff subheading 9610.20 and relied on the export price quotes, rather than on the Indian Import Statistics, to value cores.

By letter dated April 12, 2002, the Defendant-Intervenors submitted a Chinese document which they said demonstrated that China First and Three Star had merged in 1997, three years before the POR. Defendant-Intervenors also noted the fact that China First and Three Star had offices in the same building in Shanghai. They asserted that the information concerning the two companies' merger should have been provided to Commerce in response to Commerce's questionnaires. The document, entitled "Order No. 1997 005"("the Order"), was a PRC government agency[4] order requiring the merger of Three Star and China First. It directed China First to absorb Three Star's capital and form a group company to include Three Star, and it gave China First the role of managing Three Star and coordinating Three Star's sales and purchases. As a result of its receipt of the Order, Commerce extended the deadline for submission of new factual information pursuant to 19 C.F.R. § 351.302 (2000),[5] reopened the administrative record,

---

[4] The order was issued by Shanghai Light Industy (Group) Co., Ltd., "a state-owned corporate entity that functioned like a government agency with administrative responsibility for the over-sight of state owned assets that was the corporate successor to the former Shanghai Municipal State Assets Management Committee." China First's Motion at 4.

[5] 19 C.F.R. § 351.302 sets forth the procedures for requesting an extension of a time limit:

and sought comments from interested parties regarding the Order.

On May 24, 2002, Commerce issued a supplemental questionnaire to China First and Three Star that asked questions regarding the alleged merger between the two companies and accepted the Defendant-Intervenors submission. By letter dated June 4, 2002, China First and Three Star filed various documents in response to Commerce's "opportunity allowing China First and Three Star to submit rebutting, clarifying and correcting information concerning the alleged merger between the two companies." China First's Motion at 10. On June 6, 2002, China First and Three Star responded to Commerce's supplemental questionnaire of May 24, 2002. In their responses, the companies stated that they had never merged as claimed by the Defendant-Intervenors.

On June 11, 2002, Defendant-Intervenors submitted to Commerce a series of photographs taken at a Chinese domestic trade fair held in Beijing from May 7-9, 2002, which they said showed China First and Three Star jointly marketing pencils. They also submitted a series of documents that were included in the administrative record of the previous review. Subsequently,

---

(b) Extension of time limits. Unless expressly excluded by statute, [Commerce] may, for good cause, extend any time limit established by this part.

(c) Requests for extension of specific time limit. Before the applicable time limit specified under § 351.301 expires, a party may request an extension pursuant to paragraph (b) of this section. The request must be in writing and state the reasons for the request. An extension granted to a party must be approved in writing.

(d) Return of untimely filed or unsolicited material. (1) Unless the Secretary extends a time limit under paragraph (b) of this section, the Secretary will not consider or retain in the official record of the proceeding:

(i) Untimely filed factual information, written argument, or other material that the Secretary returns to the submitter, except as provided under § 351.104(a)(2).

on June 13, 2002, China First submitted a rebuttal including documents intended to explain the photographs.

As a result of the Order, Commerce reevaluated the evidence regarding the relationship between Three Star and China First. Commerce found that "the degree of interaction between these two companies [was] far greater than . . . previously believed and the form this interaction takes corresponds very closely to Order 005 as it was issued by SLI, indicating that the order may have been effectively implemented." Issues and Decision Memorandum for the Administrative Review of Certain Cased Pencils from the People's Republic of China; Final Results, Comment 12 at 36 ("Issues and Decision Memorandum"). In addition, Commerce rejected Plaintiffs' arguments that cores should be valued using private party price quotes and instead continued to use the Indian Import Statistics.

Commerce considers the PRC a nonmarket economy ("NME") country, thus, classifying it as an administering authority which did not operate on market principles of cost or pricing structures, pursuant to 19 U.S.C. § 1677(18) (2000).[6] Commerce selected a surrogate market economy against which to value the PRC's factors of production ("FOPs").

**2**
**Guangdong**

During this administrative review, Guangdong responded to Commerce's questionnaires under protest and requested that Commerce terminate its review because it only exported pencils produced by Three Star, and thus, claimed it was excluded by the order during the period of

---

[6] An NME is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18) (2000).

review.  See Initiation of Antidumping Duty Investigations: Certain Cased Pencils From the People's Republic of China and Thailand, 58 Fed. Reg. 64,548 (Dec. 8, 1993).  Guangdong had been excluded previously from the original Antidumping Order because Commerce determined that Guangdong had a zero margin and it exported pencils produced by Three Star.  Commerce explained that it excluded "from the application of any order issued imports of subject merchandise that are sold by . . . Guangdong and manufactured by the producers whose factors formed the basis for the zero margin."[7] Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 55,625, 55,631 (Nov. 8, 1994) ("Final Determination").  The Final Determination did not include the identities of the referenced producers, however, the antidumping order issued on December 28, 1994, excluded the exporter/producer combination China First/China First, and Guangdong/Three Star.[8] Response Brief of Defendant-Intervenors Pencil Section, Writing Instrument

_____

[7] Commerce stated that Guangdong was excluded because under the NME methodology:

> the zero rate for each exporter is based on a comparison of the exporter's U.S. price and FMV based on the factors of production of a specific producer (which may be a different party).  The exclusion, therefore, applies only to subject merchandise sold by the exporter and manufactured by that specific producer.  Merchandise that is sold by the exporter but manufactured by other producers will be subject to the order, if one is issued.  This is consistent with *Jia Farn* [Jia Farn Manufacturing Co. v. United States, 17 CIT 187 (1993)] which held that exclusion of merchandise manufactured and sold by respondent did not cover merchandise sold but not manufactured by respondent.  Therefore, merchandise that is sold by China First or Guangdong but produced by another producer is subject to suspension of liquidation at the "all others" cash deposit rate.

Final Determination, 59 Fed. Reg. at 55,631.

[8] Petitioners challenged Commerce's Final Determination and Commerce requested and received a remand order from the Court to correct procedural deficiencies in the investigation, and thereafter conducted a remand investigation.  The remand proceedings resulted in a

9

Manufacturers Association, et al., Pursuant to Rule 56.2 to Brief Filed by China First Pencil Co., Ltd., et al. at 4 ("Defendant-Intervenor's Response to China First").

On July 11, 2001, Guangdong and Three Star responded to Commerce's supplemental questionnaire and provided copies of their financial statements for 2000. Commerce found in its Final Results that the China First/Three Star entity was distinct from the Three Star entity which was excluded from the antidumping order. Issues and Decision Memorandum, Comment 1 at 3. Commerce decided not to exclude the Three Star/Guangdong sales chain from the order and to treat China First and Three Star as a single entity for the purposes of assigning the antidumping duty rate. Ultimately, Commerce assigned to Guangdong the PRC-wide rate with respect to its other sales. At the time of the initiation of the 1999-2000 review, the China-wide rate applicable to any company whose separate rate was not identified because it had never responded to Commerce's questionnaires was 53.65 percent. Commerce calculated a zero antidumping duty rate for Guangdong's exports to the United States of subject merchandise by Three Star and therefore excluded the Guangdong/Three Star export/production channel from the order.

**3**
**Kaiyuan and Laizhou**

Commerce issued questionnaires to Kaiyuan and in response, Kaiyuan and its supplier

---

determination that China First was selling pencils at less than fair value, but that Guangdong was not. The CIT and the Federal Circuit affirmed the remand determination. See Writing Instrument Mfrs. Ass'n, Pencil Section v. United States, 21 CIT 1185 (1997), *aff'd without opinion*, Writing Instrument Mfrs. Ass'n v. United States, 178 F.3d 1311 (Fed. Cir. 1998). Commerce issued an amended antidumping duty order that covered pencils made and exported by China First, which excluded the exporter/producer combination Guangdong/Three Star. Certain Cased Pencils from the People's Republic of China; Notice of Amended Final Determination of Sales at Less than Fair Value and Amended Antidumping Duty Order in Accordance with Final Court Decision, 64 Fed. Reg. 25,275 (May 11, 1999).

10

Laizhou City Guangming Pencil-Making Co., Ltd. ("Laizhou"), provided information concerning the latter's Factors of Production ("FOP") in a Section D questionnaire response. Laizhou produced the subject merchandise exported by Kaiyuan, and on April 27, 2001, Laizhou prepared the section D questionnaire response, which Kaiyuan filed with Commerce. Plaintiff Kaiyuan claimed that in its FOP data Laizhou included an inaccurate translation of the Chinese word "paraffin wax" that was unintentionally translated into "petrol wax."

Defendant-Intervenors suggested that Commerce seek additional information from Kaiyuan concerning Laizhou's FOPs, because they believed that the information provided in the Section D response for a number of factors provided insufficient detail for surrogate valuation purposes. Commerce issued a request to Kaiyuan, and Kaiyuan and Laizhou provided copies of invoices. Subsequently, other parties to the review, but not Kaiyuan, submitted surrogate value data, including Indian and Indonesian import statistics. The data submitted to Commerce included Indian import statistics for HTS subheading 9610.20. In the preliminary results, Commerce determined the surrogate value of petrol wax using Indonesian import statistics for HTS item 2712.90.900, "other petroleum jelly." Commerce determined the value of the cores using Indian tariff subheading 9610.20.

Kaiyuan submitted a letter dated February 8, 2002, which requested that Commerce make corrections on behalf of Kaiyuan and Laizhou. Kaiyuan's Motion at 3. In this letter, Kaiyuan identified the type of wax used in the production of its pencils as "Parafinicmax- Melting point: 53C-56C." Id.

11

**B.**
**Results of the Department of Commerce's Investigation**

On July 25, 2003, Commerce published a notice announcing its final results.[9]  Final Results, 67 Fed. Reg. at 48,612.  In those results, Commerce changed its rescission of the review as to Guangdong and Three Star, found Three Star to be affiliated with China First, held that Three Star and China First were "sufficiently entwined to warrant assigning the combined entry a separate rate," and assigned Three Star the same rate as it found for China First.  Guangdong was assigned the China-wide rate of 123 percent, the rate based on calculations for a new respondent.

On July 30, 2002, Kaiyuan asked Commerce to amend its Final Results to correct clerical errors reflected in the calculation of Kaiyuan's dumping margin.  Memorandum from Holly A. Kuga, Senior Director, Import Administration, Office IV to Bernard T. Carreau, Deputy Assistant Secretary for Import Administration, Group II, Antidumping Duty Administrative Review of Certain Cased Pencils from the People's republic of China -Final Results, Allegation of Ministerial Errors; Kaiyuan's Motion for Judgment on the Agency Record, Appendix at 9 ("Kaiyuan's Appendix").  Commerce rejected Plaintiff Kaiyuan's request that cores should be valued using private party price quotes and continued to use Indian import statistics.  Commerce rescinded the review with respect to Laizhou.  Final Results, 67 Fed. Reg. at 48,612.  Additionally, on July 31, 2002, Plaintiffs China First filed a submission alleging that Commerce made ministerial errors.  Subsequently, on August 5, 2002, the Defendant-Intervenors submitted comments rebutting some of Plaintiffs allegations. Commerce found that the factual information

---

[9] By notice, dated May 8, 2002, Commerce indicated that it was not practicable to complete the review in the time allotted by statute and so extended the final results until July 16, 2002.

submitted in support of Kaiyuan's request for correction of ministerial errors was untimely. By a notice dated September 11, 2002, Commerce revised its Final Results, and amended the rates applicable to China First and SFTC, and consequently revised the China-wide rate to 114.9 percent. Amended Final Results, 67 Fed. Reg. at 59,049.

## III
## Arguments

### A
### Plaintiffs China First

Plaintiffs China First argue that Commerce's finding that Three Star is effectively part of China First is without basis, unsupported by substantial evidence, and contrary to law. Additionally, they claim that Commerce erroneously initiated a review of Guangdong and then erroneously determined that Guangdong was not entitled to a separate rate, but rather the "China-wide" rate of 114.90 percent. This, they argue, effectively applied adverse facts available to Guangdong. Finally, Plaintiffs claim that Commerce erroneously used Indian import statistics to value black and color cores used by China First and SFTC's suppliers.

Defendant and Defendant-Intervenors' claim that Commerce's decision to initiate a review of Guangdong; assign Guangdong the PRC-wide margin rate; determine that China First and Three Star are sufficiently intertwined and should be considered a single entity for purposes of review; and determine the surrogate valuation for pencil cores using Indian import data are supported by substantial evidence and otherwise in accordance with law.

**B**
**Plaintiffs Kaiyuan**

Plaintiffs Kaiyuan argue that Commerce's use of a surrogate value for "petrol wax," instead of "paraffin wax," is neither in accordance with law nor supported by substantial evidence in the administrative record. Nor, Plaintiffs Kaiyuan claim, is Commerce's use of surrogate value for black pencil cores in accordance with law and supported by substantial evidence in the administrative record.

Defendant and Defendant-Intervenors claim that Commerce's decision not to correct Plaintiffs Kaiyuan's error, and Commerce's utilization of data from Indian import statistics as the surrogate value for black pencil cores was supported by substantial evidence and otherwise in accordance with law.

**IV**
**Standard of Review**

In reviewing Commerce's antidumping determinations, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1999); Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Timken Co. v. United States, 894 F.2d 385, 388 (Fed. Cir. 1990); Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). "Substantial evidence supporting an agency determination must be based on the whole record, and a reviewing court must take into account not only that which supports the agency's conclusion, but also "whatever

in the record fairly detracts from its weight." Melex USA, Inc. v. United States, 19 CIT 1130, 1132 (1995) (citing Universal Camera Corp v. NLRB, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951)). However, the possibility of drawing two inconsistent conclusions from evidence contained in the record does not render Commerce's conclusion unsupported by substantial evidence. Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 81 S. Ct. 1018, 16 L. Ed. 2d 131 (1966).

The court determines whether Commerce's interpretation and application of the antidumping statutes are "in accordance with law" by applying the two-step analysis prescribed in Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ("Chevron"). Under the first step, the Court reviews Commerce's construction of the statute to determine whether Congress has directly spoken to the question at issue. See id. at 842. If the statute unambiguously deals with the matter at issue, the court and the agency must give deference to Congress's intent. Id. at 842-43. The court determines Congress's intent by employing the "traditional tools of statutory construction," by first examining the statute's text and giving it its plain meaning, because a statute's text is Congress's final expression of its intent. Id. at 843 n.9. "If the intent of Congress is clear, that is the end of the matter." Id. at 842

If, after employing the first prong of the Chevron two-step analysis, the court determines that the statute is silent or ambiguous as to the issue, the court must then decide whether Commerce's construction is permissible, rational, reasonable, and supported by the record as a whole. See id., 467 U.S. at 843; Koyo Seiko Co. v. United States, 24 CIT 364, 367 (2000). The court examines Commerce's interpretation to determine whether it is reasonable by considering

15

such factors as the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole. See Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 545 (1998).

**V**
**Discussion**

Commerce is required to impose antidumping duties on foreign goods that are being or are likely to be sold in the United States at less than fair value. 19 U.S.C. § 1673(1) (2000); Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed. Cir. 2001). Administrative reviews of antidumping duties are conducted in accordance with 19 U.S.C.§ 1675 (2000). Section 1675(a)(2)(A) requires that Commerce "determine . . . the normal value ["NV"] and export price ["EP"] (or constructed export price ["CEP"]) of each entry of subject merchandise, and . . . the dumping margin for each such entry." 19 U.S.C. § 1675(a)(2)(A). The dumping margin is the difference between the NV and the export price EP or CEP of the subject merchandise. 19 U.S.C. § 1677b(a) (2000).

In a "market economy" antidumping case, the NV of a product is the price at which the foreign product is first sold in the exporting country. 19 U.S.C. § 1677b(a)(1)(B)(i); Shakeproof Assembly Components Div. of Ill. Tool Works v. United States, 268 F.3d 1376, 1379 (Fed. Cir. 2001). Antidumping cases involving an NME, however, require that the subject product's NV be determined, if possible, as if a market economy country were involved. See Baoding Yude Chem. Indus. Co. v. United States, 170 F. Supp. 2d 1335, 1337 (2001).

The antidumping statute provides that if subject merchandise is exported from an NME, and "the administering authority finds that available information does not permit the normal

16

value of the subject merchandise to be determined," Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1); Anshan Iron & Steel Co. v. United States, __CIT__, SLIP OP. 2003-83 at 8-9, 2003 Ct. Int'l Trade LEXIS 109 (July 16, 2003). Commerce may determine the NV of merchandise exported from an NME by valuing the FOPs based on the "best available information" in "one or more market economy countries that are at a level of economic development comparable to that of the non-market economy country" and that is a significant producer of merchandise "comparable" to the subject merchandise, pursuant to 19 U.S.C. § 1677b(c)(1)-(2).[10]

Under the statute, Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 201 F. Supp. 2d 1316, 1321 (CIT 2002). In general, Commerce derives the best available information from the answers to the questionnaires issued during the course of the investigation. In making its determination, Commerce must also assess the reliability of the NME company's information

---

[10] Additionally, 19 C.F.R. § 351.408(c) (2000) provides for the calculation of NV for merchandise from NME countries. It states that:

> For purposes of valuing the factors of production, general expenses, profit, and the cost of containers, coverings, and other expenses . . . under section 773(c)(1) of the Act the following rules will apply:

> > (1) Information used to value factors. [Commerce] normally will use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, [Commerce] normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, [Commerce] normally will value the factor using the price paid to the market economy supplier.

17

and determine whether it does constitute the best available information for purposes of the FOP analysis. Olympia Indus., Inc. v. United States, 23 CIT 80, 83 (1999).

Once the investigation is complete, Commerce instructs the United States Bureau of Customs and Border Protection ("Customs") to assess antidumping duties. Commerce conducts its administrative review in antidumping proceedings involving NMEs, such as the PRC, with the rebuttable presumption that all companies within the country are subject to government control.[11] Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997). All companies are assessed a single antidumping duty deposit rate unless they demonstrate that they are independent of government control. Commerce's instruction to Customs to apply the "all others" rate in an NME investigation is limited to companies that established their entitlement to a separate rate and expressed a willingness to participate at the investigative stage, but which Commerce did not investigate. This is unlike market economy cases, in which Commerce applies the "all others" rate to companies for which a company-specific rate is not applicable.[12] See Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002).

_____

[11] In its Preliminary Results, Commerce stated that "[i]n every case conducted by [Commerce] involving the PRC, the PRC has been treated as an NME." Preliminary Results, 67 Fed. Reg. at 2,405. None of the parties to this proceeding contested Commerce's treatment of the PRC as an NME. Id.

[12] In 1991, Commerce determined that individual dumping rates were inappropriate in an NME country, and NME exporters would be subject to a single, countrywide antidumping duty rate unless they demonstrated legal, financial and economic independence from their government. Transcom, 294 F.3d at 1373; see Iron Construction Castings From the People's Republic of China; Final Results of Antidumping Duty Administrative Review, 56 Fed. Reg. 2,742, 2,744 (Jan. 24, 1991). This is referred to as the NME Presumption. Sigma Corp. v, United States, 20 CIT 852, 858 (1996).

**A**
**Commerce's Determination that Three Star and China First Should be Collapsed and Considered a Single Entity is not in Accordance With the Law**

In its Final Results, Commerce concluded that China First and Three Star were "sufficiently intertwined to warrant assigning the combined entity a separate rate." Issues and Decision Memorandum, Comment 12 at 35. Plaintiffs China First claim that Commerce erroneously found that Three Star was effectively part of China First.

Although not required by the Tariff Act of 1930, Commerce has a practice of assigning multiple entities a single antidumping margin in a market economy case when it determines that the entities are affiliated during an antidumping review. See Hontex Enters., Inc. v. United States, 248 F. Supp. 2d 1323, 1338 (CIT 2003); see also Antidumping Manual, Chapter 7 at 24. Commerce "collapses" those companies into one and then calculates a single weighted-average margin for those affiliated companies. In order to collapse companies in a market economy investigation, Commerce must first determine that the companies are affiliated. Pursuant to 19 U.S.C. § 1677(33)(F), affiliated or affiliated persons means "two or more persons directly or indirectly controlling, controlled by, or under common control with, any person." After determining affiliation, Commerce then examines whether the producers share "production facilities for similar or identical products." 19 C.F.R. § 351.401(f)(1) (2000). Finally, Commerce determines whether there is "significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(2). Commerce's initial affiliation determination is concerned with the parties potential to impact decisions concerning price or production, while Commerce's collapsing determination is concerned with the potential for manipulation of price or production by the parties.

19

In making its collapsing determination, Commerce considers factors such as the level of common ownership, the presence of interlocking boards of directors, and the extent to which the companies are intertwined as evidenced by coordination of pricing decisions, shared employees, or transactions between the companies.[13] Id.; see Allied Tube & Conduit Corp. v. United States, 24 CIT 1357, 1374 (2000). Collapsing "has been reviewed by this court in the context of market economy producers," and found to be a permissible interpretation of the antidumping statute. Hontex, 248 F. Supp. 2d at 1338.

---

[13] The regulation, 19 C.F.R. § 351.401(f), provides that the affiliated producers in antidumping proceedings are treated as a single entity where:

> those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.
>
> (2) Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:
>
> (i)     The level of common ownership;
>
> (ii)    The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
>
> (iii)    Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.

19 C.F.R. § 351.401(f).

**1**
**Commerce's "Sufficiently Intertwined" Methodology in this Case is not a Permissible Interpretation of the Antidumping Statute**

Commerce determined that China First and Three Star were a single entity and should receive a single antidumping duty margin. Defendant claims that the market economy regulatory "collapsing" analysis is not directly applicable because China First and Three Star are NME producers. Commerce stated that "antidumping cases involving nonmarket economies are unique because the centralized pricing and production decisions of these countries make internal prices and costs 'inherently suspect.'" Issues and Decisions Memorandum, Comment 12 at 35. It also stated that because the statutes and regulations do not provide explicit guidance on how to analyze relationships between companies located in a nonmarket economy country, it analyzes their relationships on a case-by-case basis. Id.

Defendant stated that when "determining whether [China First] and Three Star should be treated as a single entity, Commerce considered whether the companies were 'sufficiently intertwined.'" Defendant's Opposition at 15; see Issues and Decisions Memorandum, Comment 12 at 35. Because the collapsing statute is silent in the NME context, Commerce's generally conferred authority permits the agency to address the ambiguity. See United States v. Mead, 533 U.S. 218, 229, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001. A reviewing court "is obliged to accept Commerce's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable." Mead, 533 U.S. at 229; see Chevron 467 U.S. at 843-44. "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertise, and to the persuasiveness of the agency's position." Mead, 533

U.S. at 228; see Chevron, 467 U.S. at 842-43.  To uphold Commerce's NME collapsing

methodology, Commerce must have clearly articulated which set of factors formed the basis of

its collapsing determination. See Hontex, 248 F. Supp. 2d at 1341 (CIT 2003).

Commerce has not articulated a cognizable procedure for collapsing NME companies nor

has it followed its former methodology.  In determining whether Commerce's collapsing practice

is in accordance with law in this case, "the question for the court is whether the agency's answer

is based on a permissible construction of the statute."[14]  Koenig & Bauer-Albert A.G. v. United

States, 24 CIT 157, 159 (citing Chevron, 467 U.S. at 843).  Prior to the reduction of Commerce's

current collapsing methodology in market economy cases to regulations, the court in Queen's

Flowers de Colom. v. United States, 21 CIT 968, 979 (1997) reviewed Commerce's market

economy collapsing methodology, and stated that because Commerce had "articulated a

reasonable set of inquiries for answering the central question, whether parties are sufficiently

related to present the possibility of price manipulation . . . the Court finds Commerce's

articulation of collapsing factors . . . to be in accordance with law." Hontex, 248 F. Supp. 2d at

1342 (citing Queen's Flowers, 981 F. Supp. at 628).  The court's analysis in Hontex further

_____

[14] In Koenig, the court had originally ordered a remand because Commerce had not
substantiated its decision to collapse plaintiff's affiliated companies in determining antidumping
duties for respondent's merchandise imported into the United States.  The plaintiff had exported
a product produced at one location from a subsidiary in another location.  The court stated in a
footnote that Commerce must decide "whether the affiliated companies are sufficiently
intertwined as to permit the possibility of price manipulation." Koenig, 24 CIT at 160 n.5.  It
reviewed Commerce's remand  determination and stated that because Commerce had considered
factors such as the level of common ownership; whether the companies had interlocking boards
of directors; whether the companies had production facilities for similar or identical products;
and whether the companies operations were intertwined, as evidenced by coordination in pricing
decisions, shared employees or transactions between the companies, its determination was
permissible. Id.

explained that "to the extent that Commerce has followed its market economy collapsing regulations the NME exporter collapsing methodology is necessarily permissible. Where the NME exporter methodology departs from these regulations, however, the court must examine it to determine whether it is a permissible interpretation of the antidumping statute." Id. In this case, Commerce has departed from the regulations and interpreted the antidumping statutes.[15] One of its decisions was that 19 U.S.C. § 1677(33)(F)'s definition of affiliated, "two or more persons directly controlling, controlled by, or under common control with, any person" was not instructive in the NME context. Defendant's Opposition at 16. Commerce is free to develop its practice regarding NME collapsing. However, in Hontex, Commerce found 19 U.S.C. § 1677(33)(F) instructive.[16] 248 F. Supp. 2d at 1342 (stating that "[h]ere, Commerce identified 19

---

[15] In general, the court is not bound by the agency regulations, but rather is obliged to apply the statutory provisions. See Writing Instrument Mfrs. Ass'n, Pencil Section v. United States, 21 C.I.T. 1185, 1193 (1997). Thus, if Commerce chooses to focus on the statutory language to the neglect of its own regulations in making its determination the court will review the statutory interpretation to see if it is in accordance with law. See id. Commerce's regulations do not stand on their own, but rather find their basis in the statutory language. See id.

[16] In Hontex, Commerce considered whether two companies were "connected in such a way that it would frustrate the purpose of the statute to grant [them] separate antidumping duty margins." 248 F. Supp. 2d at 1341. Specifically, it considered whether the record showed any control relationships that may have existed between the two companies as contemplated by 19 U.S.C. § 1677(33). Furthermore, in the Department of Commerce's Final Results of Determination Pursuant to Court Remand, for Hontex, 248 F. Supp. 2d at 1323, Public Version of Proprietary Doc. A-570-848 at 9, Commerce states that

> in examining whether NME exporters should be collapsed and treated as one entity, the Department applies the factors identified in its regulations concerning collapsing, in addition to examining the export decisions of the exporters being examined. In addressing whether a significant potential for manipulation exists, the Department will consider whether there is common control among the exporters based on the concept of control provided for in section 771(33) of the act.

23

U.S.C. § 1677(33)(F) as 'instructive' for determining whether two NME exporters are affiliated . . . . [T]o the extent that Commerce investigated by means of questionnaires and otherwise in accordance with established regulations whether the Companies were affiliated, such portion of its [collapsing] methodology is a permissible interpretation of the antidumping statue."). Commerce has not explained adequately why affiliation is not similarly instructive in this instance.

It appears that Commerce examined the information before it and, based on that information, determined which portions of its market economy collapsing regulations were satisfied and deemed the remainder of the regulations inapplicable. Defendant states in its brief that "[t]he intertwining of [China First] and Three Star creates the significant potential for manipulation because [China First/Three Star] can circumvent the order by utilizing the exclusion granted to the Guangdong/Three Star export/production channel." Defendant's Opposition at 25. Defendant-Intervenors provided Commerce with information regarding the relationship between Three Star and China First Pencil. Final Results, 67 Fed. Reg. at 48,612. They submitted a document issued in January 1997 requiring China First and Three Star to merge. The document is entitled the "Order of Shanghai Light Industry Holding (Group), Order # (1997) 005" ("the Order"), and addresses China First and Shanghai Pen & Pencil Company. According to the Defendant-Intervenors, the Order directs China First to absorb Three Star's capital and form a group company that includes Three Star. Additionally, the Order instructs China First to manage Three Star and coordinate its sales and purchases during the capital reorganization. Plaintiffs China First claim that "[a]s China First documented over the course of two separate reviews, through the disclosure of financial statements spanning a five-year period,

24

China First has *never* invested in, purchased, merged with, or even engaged in joint marketing efforts with Three Star." China First's Motion at 20 (emphasis in original).

Commerce appears to have relied significantly on the Order in making its determination to collapse China First and Three Star. Commerce found that the timing and circumstances surrounding certain loans called into question China First's claim that it was Three Star's competitor. Commerce also found that evidence on the record indicated that China First changed its name from China First Pencil Co., Ltd. to China First Pencil Group Co., Ltd. See Issues and Decision Memorandum, Comment 12 at 37. Commerce noted that the internet page that Defendant-Intervenors submitted showed that Three Star's address was the same as China First, except for the floor number. Therefore, based on the information submitted by the Defendant-Intervenors, Commerce found that the degree of interaction between the two companies was greater than previously believed, and that the interaction between the company's took a form corresponding very closely to the Order as issued by SLI.

Defendant states in its brief that "the issue here is not whether [China First] and Three Star actually merged. Rather, the issue is whether [China First] and Three Star acted in a manner demonstrating that they are sufficiently intertwined, creating the potential for manipulation." Defendant's Opposition at 24.

Commerce's actions should promote rule of law; supremacy of specifically defined government practice, over arbitrary government action. Absent a definite and articulated set of inquiries, the court is unable to determine whether Commerce's conclusion that the companies did in fact act in a manner that created the potential for manipulation was reasonable. Commerce decided that Three Star was effectively part of China First, and consequently, the potential for

25

manipulation between these two entities was significant.[17]  This conclusion has no legal basis.

On remand, Commerce must articulate a set of inquiries or methodology through which the court may independently ascertain whether the evidence supports Commerce's findings.

Plaintiffs China First argue that even if Commerce considered China First and Three Star to be affiliated, there was no basis upon which to collapse them.  Plaintiffs China First claim that Three Star was a subsidiary of SLI and that SLI was Three Star's sole investor and managing authority.  The court will not decide in this case whether this information is sufficient to collapse China First and Three Star because Commerce has failed to articulate an acceptable NME collapsing methodology under which the court might examine the basis for its decision.

---

[17] Defendant stated in its brief that

> Commerce was concerned about the potential manipulation because Three Star and [China First] are producers of the subject merchandise.  The intertwining of [China First] and Three Star creates the significant potential for manipulation because [China First/Three Star] can circumvent the order by utilizing the exclusion granted to the Guangdong/Three Star export/ production channel.  As Commerce stated:
>
> > We note that in finding Three Star and [China First] sufficiently intertwined to warrant assigning the combined entity a separate rate, we are also finding that Three Star's sales through Guangdong are no longer excluded from the order.  These determinations reflect the fact that, based on the evidence, Three Star is effectively part of [China First], and at least does not operate as a separate entity.  Consequently, the potential for manipulation between these two entities is significant.
>
> Defendant's Opposition at 25 (citing Issues and Decision Memorandum, Comment 12 at 35).

**B.**
**Commerce's Determination Regarding Guangdong Is Not Accordance with the Law and Must be Re-Examined**

Plaintiffs China First claim that a negative dumping finding requires that any reseller found, on a weighted-average basis, not to be dumping is excluded from the order. An antidumping duty order is issued when an a final determination of an antidumping investigation is affirmative. 19 U.S.C. § 1673d(c)(2) (2000). 19 C.F.R. § 351.204(e)(3) (2000) provides that "[i]n the case of an exporter that is not the producer of subject merchandise, the Secretary normally will limit an exclusion of the exporter to subject merchandise of those producers that supplied the exporter during the period of investigation."[18] In the initial antidumping order, Guangdong, who is a reseller/exporter of pencils, was determined not to be selling pencils at less than fair value, Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China, 59 Fed. Reg. 55,625, 55,631 (Nov. 8, 1994), and was excluded from the order, Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 66,909 (Dec. 28, 1994) ("Antidumping Order").[19] China First's

---

[18] Furthermore, 19 C.F.R. § 351.204(e)(3) provides this example:

> During the period of investigation, Exporter A exports to the United States subject merchandise produced by Producer X. Based on an examination of Exporter A, the Secretary determines that the dumping margins with respect to these exports are *de minimis*, and the Secretary excludes Exporter A. Normally, the exclusion of Exporter A would be limited to subject merchandise produced by Producer X. If Exporter A began to export subject merchandise produced by Producer Y, this merchandise would be subject to the antidumping duty order, if any.

[19] The order's language was based on the final determination's conclusion that it "would exclude from an order imports of subject merchandise that are sold by either China First or Guangdong and manufactured by the producers whose factors formed the basis for the zero margin." Antidumping Order, 59 Fed. Reg. at 66,910; See Response Brief of Defendant-Intervenors Pencil Section, Writing Instrument Manufacturers Association, et al., Pursuant to

Motion at 3.

Commerce had originally indicated that the exclusion of Guangdong from the antidumping order was in accordance with 19 C.F.R. § 353.21 (1994) and consistent with Jia Farn Mfg. Co. v. United States, 17 CIT 187 (1993).[20] Plaintiffs claim that the concerns raised in Jia Farn are not present in this case and Guangdong should have been excluded from the review.

In Jia Farn, a producer/exporter was excluded from an antidumping order as a producer/exporter. The plaintiff was alleged to be circumventing the antidumping order by acting as a reseller of products manufactured or produced by other companies whose products were subject to the order. Commerce determined that Jia Farn was transshipping merchandise manufactured by other companies under the order. Commerce argued that it had authority under 19 U.S.C. § 1675 to conduct administrative reviews of Jia Farn as a reseller, exporting the merchandise produced by other manufacturers. Jia Farn, 17 CIT at 191. The court explained that "the exclusion of a firm from the order applies only when the firm acts in the same capacity as it was excluded from the order." Id. at 192. Likewise, in this case, the regulations permit

Rule 56.2 to Brief Filed by China First Pencil Co., Ltd. et al.("Defendant-Intervenor's Response to China First") at 4.

[20] Section 353.21 required that Commerce publish in the Federal Register an "Antidumping Duty Order" that excluded from the application of the order any producer or reseller for which it found that "there was no weighted-average dumping margin during the period for which [Commerce] measured dumping in the investigation." This section was replaced by 19 C.F.R. § 351.204(e) (1997), which states that "[Commerce] will exclude from an affirmative final determination under section . . . 735(a) of the Act or an order under section . . . 736(a) of the Act, any exporter or producer for which [it] determines an individual weighted-average dumping margin . . . of zero or *de minimis*." "In the case of an exporter that is not the producer of the subject merchandise, [Commerce] normally will limit an exclusion of the exporter to subject merchandise of those producers that supplied the exporter during the period of investigation." 19 C.F.R. § 351.204(3).

Commerce to include Guangdong if it begins to export merchandise produced by a supplier subject to the antidumping order. See 19 C.F.R. § 351.204 (2000); Jia Farn, 17 CIT at 192-93. Thus explained, Commerce has the authority to inquire whether shipment of merchandise to another manufacturer subjected it to the antidumping order. Commerce properly asked that question about Guangdong.

Plaintiffs also argue that, if China First and Three Star are collapsed into one entity, Guangdong should receive the collapsed rate because it cooperated in the review, underwent verification, and only exported pencils from Three-Star. See China First Motion at 38. The exclusion given to Guangdong in the antidumping order was narrow, and it participated in this antidumping review and had sufficient notice that if it exported goods from one of the named producers it would be subject to their antidumping rate. Id. at 41. After participating in this review, however, Commerce then assigned Guangdong the China-wide rate.

Commerce's practice as to NME exporters is to presume all exporters are under the control of the central government until they demonstrate an absence of government control. This approach has been upheld by the courts. Air Prods. & Chems. Inc. v. United States, 22 CIT 433, 436 (1998); Sigma Corp., 117 F.3d at 1405 (Fed. Cir. 1997). "Those exporters who do not respond or fail to prove absence of *de jure/de facto* control are assigned the country-wide rate. Therefore, a NME exporter normally receives one of two rates: either the separate rate for which it qualified or a country-wide rate." Coalition for the Pres. of Am. Brake Drum and Rotor Aftermkt. Mfrs. v. United States, 23 CIT 88, 107 (1999) (citing Transcom Inc. v. United States, 22 CIT 315, 322 (1998). "This approach obviates the need for an 'all others' rate calculation." Coalition, 23 CIT at 107. Defendant states in its brief that "[a]n 'all others' rate was not

calculated during the investigative stage of this proceeding. Guangdong cites no precedent, and none exists, for calculating an 'all others' rate during an administrative review of an NME proceeding." Defendant's Opposition at 30. In Coalition, which was an NME antidumping investigation, Commerce did assign an "all others" rate, which this court found to be a reasonable.[21] 23 CIT at 107-12. The respondents in Coalition who proved an absence of government control received separate company-specific rates during the investigation; respondents who fully participated in the review, but who were not investigated, received averaged non-adverse "all others" rates; and respondents who did not qualify for separate rates or those who did not respond to questionnaires received the China-wide rate based on adverse facts available.[22] See Id. at 107. Therefore, precedent does exist for assigning an "all others" rate.

---

[21] Additionally, in Notice of Preliminary Determination of Sales at Less Than Fair Value: Honey from the People's Republic of China, 60 Fed. Reg. 14,725, 14,729-30 (Mar. 20, 1995), Commerce confronted a situation where "administrative constraints prevented it from fully investigating NME Respondents who complied fully with questionnaire requests." Coalition, 23 CIT at 110. It stated that

> Because it would not be appropriate for the Department to refuse to consider an affirmative documented request for an examination of whether these companies were independent of any non-respondent firms and then assign to the cooperative firms the rate for the noncooperative firms, which in this case is an adverse margin based on best information available, the Department has assigned a special single rate for these firms.

Id. (quoting Notice of Preliminary Determination of Sales at Less Than Fair Value: Honey from the People's Republic of China, 60 Fed. Reg. at 14,729-30).

[22] In Coalition, Commerce "investigat[ed] the selected respondents and [after] finding all but two qualified for separate rates, Commerce concluded that an average margin based on the selected Respondents should be assigned to the fully cooperative but uninvestigated Respondents." 23 CIT at 108; see Notice of Final Determinations of Sales at Less Than Fair Value: Brake Drums and Brake Rotors from the People's Republic of China, 62 Fed. Reg. 9,160, 9,173-74 (Feb. 28, 1997). "Commerce reasoned that it would be inappropriate to assign a rate based on adverse facts available that would also apply to PRC exporters who refused to

Whether Commerce ultimately determines that Three Star and China First are one entity and should be collapsed does not negate the evidence that Guangdong only exported pencils produced by Three Star. Moreover, Guangdong cooperated in this administrative review.[23] China First's Motion at 38; see Preliminary Results, 67 Fed. Reg. at 2,402. Commerce verified that Guangdong only exported pencils from Three Star. Id. In its verification report for Guangdong, Commerce stated that "[a]ll of the U.S. sales that we examined were of pencils manufactured by Three Star. We found no evidence that pencils sold to the United States were procured from producers other than Three Star." Memorandum from Case Analysts to The File, No Shipment Verification of Guangdong Stationary & Sporting Goods Import & Export Corp. in the 1999-2000 Administrative Review of Certain Cased Pencils from the People's Republic of China (A-570-827) at 4, China First's Appendix to Brief, Vol. III, Exhibit 9. Commerce did not find that Guangdong either transshipped pencils from China First or sold pencils made by China First. The record evidence solely shows that Guangdong sold pencils made by Three Star. Plaintiffs China First argue that by virtue of Guangdong's participation in the review and its verification that it only exports pencils produced by Three Star, Commerce's application of the

---

cooperate. Coalition, 23 CIT at 108.

[23] In the Preliminary Results Commerce stated that it was

> [P]reliminarily rescinding this review with respect to Three Star and [Guangdong] because they made no shipments of subject merchandise to the United States during the POR. The Department reviewed Customs data which indicates that Three Star and [Guangdong] did not export subject merchandise to the United States during the POR. . . .

67 Fed. Reg. at 2,403.

China-Wide rate effectively applied adverse facts available to Guangdong.

Commerce has previously assigned the China-wide rate to respondents who did not qualify for separate rates or those who did not respond to questionnaires based on adverse facts available. See Coalition, 23 CIT at 107. It has assigned an "all others" rate to cooperative, participating respondents. Commerce normally calculate its antidumping assessment rate by "dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes." 19 C.F.R. § 351.212(b)(1) (2000). And the court has previously found that Commerce's assignment of a rate which is the simple average of dumping margins determined for the exporters individually investigated to be in accordance with the law. Coalition, 23 CIT at 111-12.

Certainly, the antidumping statutes give Commerce the discretion to apply an adverse inference when a party fails to comply with its requests for information for determining that rate.[24] See 19 U.S.C. § 1677e(b) (2000). However, in order to make this inference, Commerce must first make a determination that facts available is warranted pursuant to 19 U.S.C. § 1677e(a). Following that determination, Commerce may then apply an adverse inference if Commerce makes the additional finding that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b). In applying adverse facts available, Commerce must articulate the reasons for its determination that a party failed to act to the best of its ability. Mannesmannrohren-Werke AG v. United States,

---

[24] Commerce may employ adverse inferences to a party who has not cooperated in supplying missing information "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-826 at 870 (1994).

23 CIT 826, 838 (1999).  If Commere applies an adverse facts available rate, it must "balance the statutory objective of finding an accurate dumping margin and inducing compliance, rather than creating an overly punitive result." Timken Co. v. United States, 354 F.3d 1334, 1345 (Fed. Cir. 2004); see F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032-33 (Fed. Cir. 2000).  Moreover, the court in Usinor Sacilor v. United States, rejected an adverse facts available rate for a respondent who has substantially complied with Commerce's requests. 19 CIT 1314, 1316 (1995) ("assessing the circumstances present -- i.e., Usinor's near total compliance with Commerce's limited reporting arrangement as well as the presence of particular data flaws that were outside of Usinor's control -- the court finds that Commerce's inclusion of the highest non-aberrant margin in the weighted average calculated margin is improper."); see Coalition, 23 CIT at 115.

Guangdong participated in the review and the verification, therefore, Commerce's application of the China-wide rate is not in accordance with the law and effectively applies a punitive result to a cooperative respondent.[25] See Id. at 107-12. Additionally, Commerce's NME collapsing methodology regarding Three Star and China First was not in accordance with the law.

---

[25] In Shandong Huarong Gen. Group Corp. v. United States, Slip-Op. 2003-135 at 61-62, 2003 Ct. Intl. Trade LEXIS 153 (Oct. 22, 2003), the court found that Commerce's determination to reject the Companies' separate rates evidence and, thus, assign them the PRC-wide antidumping duty margin based on the presumption of state control due to verification failures, the inadequacy of cooperation and the lack of integrity of reported data "cannot be the basis for assigning the Companies the PRC-wide antidumping duty margin based on facts available, as it is clear the Companies did provide evidence of their entitlement to separate rates and there is no indication that any necessary information was missing or incomplete. See [Nippon Steel Corp. v. United States, 337 F.3d 1373, 1381 (Fed. Cir. 2003)]." The court did not uphold Commerce's determination in part because the parties in the case provided evidence of their independence from government control which Commerce verified, and thus, the court did not sustain Commerce's determination that the Companies should be assigned the PRC-wide antidumping duty margin based on facts available. Id. at 62-64.

Therefore, on remand, Commerce's decision regarding Guangdong as well as its application of the China-wide rate to Guangdong must be re-examined.

## C
## Commerce's Utilization of Data from Indian Import Statistics as the Surrogate Values for "Petrol Wax," instead of "Paraffin Wax," and Decision not to Correct Plaintiffs Kaiyuan's Translation Error Was in Accordance with Law and Supported by Substantial Evidence in the Administrative Record

Commerce is required to value a company's FOPs based on the "best available information," in one or more market economy countries, which are at a level of economic development comparable to that of the NME country, and "that [are] a significant producer of 'comparable' subject merchandise." Shandong Huarhong Gen. Corp. v. United States, 159 F. Supp. 2d 714, 719 (2001); see 19 U.S.C. § 1677b(c)(4) (1999). Plaintiffs reported FOPs included numerous types of wax: paraffin wax, emulsified wax, bees wax, wax, clear wax, mixed wax, and petrol wax. Memorandum from The Team to The File, Preliminary Results of the Administrative Review of Certain Cased Pencils from the People's republic of China (PRC), Selection of Surrogate Values for Factors of Production at 5-6, Kaiyuan's Appendix 12. Commerce must calculate antidumping duty margins as accurately as possible. See Rubberflex SDN. BHD. v. United States, 23 CIT 461, 469 (1999). However, in order to calculate the correct margin, an interested party must provide Commerce with "accurate, credible, and verifiable information."Gourmet Equip. Corp. v. United States, 24 CIT 572, 574 (2000). Furthermore, it is the respondent's responsibility to provide that information. Chinsung Indus. Co. v. United States, 13 CIT 103, 106 (1989).

Commerce is afforded discretion in determining what constitutes the "best available information," see Timken, 201 F. Supp. 2d at 1325, and Commerce derives this information from

a party's questionnaire responses. Commerce must determine that the information that it bases its surrogate values on is the best available; whether the information relates to the respondent's production or related to prices and values in the surrogate country. Timken, 201 F. Supp. 2d at 1325-26. Information that is provided in questionnaire responses or publicly available information used to value factors in nonmarket economy cases, allegations concerning market viability, and upstream subsidy allegations, are considered factual information. World Finer Foods, Inc. v. United States, 24 CIT 541, 549 (2000); 19 C.F.R. § 351.301(a) (1999).

Commerce, with its limited resources, cannot guarantee that the parties' submissions are correct. Murata Mfg. Co. v. United States, 17 CIT 259, 265 (1993). However, in cases where Commerce makes an error, Congress intended that Commerce establish procedures for the correction of "ministerial errors" propagated by Commerce that occur after the final results of a review are published.[26] 19 U.S.C. § 1673d(e) (2000). Ministerial errors are errors in addition, subtraction, or other arithmetic function; clerical errors that result from inaccurate copying, duplication, or the like; and any other similar types of unintentional or inadvertent errors.[27] World Finer Foods, 24 CIT at 549-50; 19 C.F.R. § 351.224(f) (1999). It is these types of ministerial errors that Commerce must correct, especially if the error is so obvious and egregious that the

---

[26] Pursuant to 19 U.S.C. § 1673d(e), Commerce "shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors."

[27] From the context of the statute and the regulations themselves, it is clear that "Congress intended to cover only an error committed by Commerce itself." Alloy Piping Prods. Inc. v. Kanzen Tetsu Sdn. Bhd., 334 F.3d 1284, 1290 (Fed. Cir. 2003).

failure to correct it would be "an abuse of discretion" and "undermine the interests of justice."[28]

Tehnoimportexport v. United States, 15 CIT 250, 258-59 (1991) (explaining that where a

plaintiff's mistake was obvious, the government's failure to correct it was an abuse of

discretion).

The procedures that Commerce promulgated to correct these errors are found in 19 C.F.R.

§ 351.224(c)(1) (2000), which provides that comments from

> A party to the proceeding to whom [Commerce] has disclosed calculations performed in connection with a preliminary determination may submit comments concerning a significant ministerial error in such calculations. A party to the proceeding to whom [Commerce] has disclosed calculations performed in connection with *a final determination* or *the final results of a review* may submit comments concerning any ministerial error in such calculations. Comments concerning ministerial errors made in the preliminary results of a review should be included in a party's case brief.

Id. (emphasis added). The regulations further provide that Commerce "will analyze any

comments received and, if appropriate . . . correct any significant ministerial error by amending

the *final determination*." 19 C.F.R. § 351.224(e) (emphasis added). On September 21, 2001,

Plaintiffs China First submitted a letter to Commerce containing comments and information

regarding "Commerce's selection of surrogate countries and the information to be used by

[Commerce] in valuing the factors of production." Kaiyuan's Appendix 11. The letter stated that

"[t]he principal materials used in Respondents production of pencils include the following

---

[28] In Serampore Indus. Pvt., v. United States, the court stated that it was "loathe to affirm a determination that might be based on a questionable record."12 CIT 825, 834 (1988). Furthermore, in Koyo Seiko Co., Ltd. v. United States, the court held that Commerce erroneously refused plaintiffs' request that it correct clerical and transcription errors in data it submitted to Commerce which was used in the final determination. 14 CIT 680, 683 (1990). The limited burden imposed by virtue of a remand ordering the correction of input errors was outweighed by the preference for accuracy. Id.

36

materials: tallow, graphite powder, kaolin (china) clay, white glue, paraffin wax, pencil slats, plastic foil/film, lacquer, erasers, and aluminum ferrules," and provided the value for "paraffin wax. Id. Plaintiffs Kaiyuan view their submission's inclusion of petrol wax as a facial error, and that Commerce should have realized a mistake had been made in Kaiyuan's submissions.

In a letter dated October 4, 2001, Commerce informed Kaiyuan that it did not possess publicly available information to value petrol wax. Defendant's Opposition at 7. Kaiyuan argues that because there were no values or technical specifications placed on the record for petrol wax, that this leads to the conclusion that it is an industry norm to use paraffin wax in the manufacturing and pencil making process and that in this particular industry wax has only one meaning. Kaiyuan's Motion at 8-9. The parties, however, provided no evidence or citation to an industry norm.[29] If a respondent's error is apparent from the face of Commerce's final decision or from the underlying calculations, Commerce is required to make corrections, see Koyo, 14 CIT at 683, and should it fail to correct that error its lack of action is arbitrary and capricious. See Alloy Piping Prods., Inc. v. United States, 334 F.3d 1284, 1292 (Fed. Cir. 2003). Moreover, if Commerce fails to correct an error that is or should have been apparent from the face of the final determination, the error in effect becomes a government error, and thus, a "ministerial error," which Commerce is statutorily required to correct. Id. at 1293.

Commerce, to the extent possible, relies on publicly available information from the

---

[29] The Kirk-Othmer Concise Encyclopedia of Chemical Technology 1260 (3d ed 1985), under mineral waxes, describes a paraffin wax as a "petroleum wax consisting principally of normal alkanes." The encyclopedia then states that petroleum wax is "outstanding as a cost-effective moisture and gas barrier . . . [m]uch of the petroleum wax produced is food-grade quality, although such quality may well be used in non-food-grade applications to simplify inventorying." Id.

relevant surrogate country to value a company's FOPs. See Antidumping Manual, Chapter 8 at 70-71. On December 31, 2001, Commerce published a letter outlining its decision to value petrol wax using Indonesian import data from the Foreign Trade Statistical Bulletin of Indonesia ("FTSBI"). Kaiyuan's Appendix 12. Commerce stated that:

> [i]n determining the appropriate surrogate value for each factor of production, we selected, where appropriate and to the extent possible, from publically available information which was: (1) an average, non-export value; (2) representative of a range of prices within the POR, or closest in time to the POR; (3) product-specific; and (4) tax-exclusive. Whenever possible, we selected surrogate values that were from the primary country in accordance with Commerce's preference to select data from a single country

Id.

In response, Kaiyuan submitted a letter dated February 8, 2002, which requested that Commerce make corrections on behalf of Kaiyuan and Laizhou. Kaiyuan's Motion at 3, Appendix 6. In this letter, Kaiyuan identified the type of wax used in the production of its pencils as "Parafinicmax- Melting point: 53C-56C." Id. Kaiyuan's FOP submissions included numerous types of wax: paraffin wax, emulsified wax, bees wax, wax, clear wax, mixed wax, and petrol wax. Kaiyuan's Appendix 12. However, in its letter of February 8, 2002, Kaiyuan did not indicate what item Parafinicmax was in addition to or what item it was to replace in its submission.

On July 30, 2002, Kaiyuan submitted a clerical-error allegation to Commerce. Kaiyuan's Appendix 8. In this letter, Kaiyuan argued that Commerce improperly used a surrogate value for petrol wax when it claimed that the record demonstrated that Kaiyuan used paraffin wax. Commerce disagreed and its memorandum stated that "throughout this segment of the proceeding, Kaiyuan unequivocally and consistently identified the type of wax used in pencil

38

production as petrol wax." Kaiyuan's Appendix 9. The court affords Commerce substantial discretion in determining what types of unintentional or inadvertent errors qualify errors are "ministerial." Shandong, 159 F. Supp. 2d at 728; Cemex, S.A. v. United States, 19 C.I.T. 587, 593 (1995).

In this case, Commerce properly refused to correct Kaiyuan's translation error. Kaiyuan did not provide clear evidence so that Commerce might determine that it was using the incorrect product in making its determination. Information that is provided in questionnaire responses or publicly available information used to value factors in nonmarket economy ("NME") cases, allegations concerning market viability, and upstream subsidy allegations, is considered factual. 19 C.F.R. § 351.301(a). Commerce use of Plaintiff's erroneous translation in making its determination does not convert Plaintiff's mistake into a "ministerial" error. Furthermore, because the mistakes in this case were made by the Plaintiff, they are not the type of "ministerial" errors Congress intended Commerce to correct. Kaiyuan's error was not so obvious or patent that it would result in injustice, nor did Commerce ignore relevant record evidence.

**D.**
**Commerce's Use of Surrogate Values in Calculating the Dumping Margin is in Accordance with Law and Supported by Substantial Evidence in the Administrative Record**

Plaintiffs China First argue that the choice of India as the principal surrogate country in an NME analogy lead to the use of data they claim is unreliable. They argue that while there is Indonesian surrogate data on the record for only 25 of the 69 FOPs, the Indonesian data is nonetheless of better quality because the Indian surrogate data available for virtually every significant factor of production are allegedly aberrational, unreliable, and non-specific.

Commerce values FOPs using the costs of the FOP in a market economy that was at a

level of economic development comparable to the PRC, and a significant producer of comparable merchandise during the POR. Commerce found India to be the appropriate surrogate country at a level of economic development comparable to the PRC, because India was comparable to the PRC in terms of per capita gross national product and the national distribution of labor. See Issues and Decision Memorandum, Comment 7 at 19; Memorandum from The Team, Through Howard Smith, Program Manager, Group II, Office 4, To The File, Factors of Production (FOP) Valuation (July 16, 2002) ("FOP Memorandum"); China First's Appendix to Brief, Vol. I Exhibit 20. Moreover, it determined that India was a significant producer of comparable merchandise. Issues and Decision Memorandum, Comment 7 at 19.

Commerce determined that Indonesia was comparable to the PRC in terms of its per capita gross national product and national labor distribution, as well as being a significant producer of comparable merchandise. Commerce relied on Indonesian values and U.S. values in instances where Indian surrogate value information was not available. For purposes of calculating NV, Commerce attempted to value the FOPs using surrogate values that were in effect during the POR. Commerce valued FOPs regarding graphite, kaolin clay, bees wax, mixed wax, wax, clear wax, lacquer, paint, dipping lacquer, glue, clear glue, foil, sealing paper, stearic acid, printing ink, key chain, plastic, foam grip, glitter, talcum powder, heat transfer film, pigment, dye, dyestuff, diluent, hardening oil, and cellulose based on Indian import data from the Monthly Statistics of the Foreign Trade of India ("MSFTI") for April-August 2000. Preliminary Results, 67 Fed. Reg. at 2,406. Commerce valued black cores, color cores, raw pencils, erasers, and ferrules based on Indian import data from the MSFTI for January-December 2000. Id. It also valued "petrol wax", tallow, paraffin wax, and emulsified paraffin wax based on Indonesian

40

import data from the Foreign Trade Statistical Bulletin of Indonesia ("FTSBI") for January-December, 2000. Kaiyuan's Appendix 12.

Plaintiffs Kaiyuan claim that the import statistics were comprised of data relating to both black and colored cores without differentiating between the two. They claim that this resulted in the calculation of a single average unit value used as the surrogate value for Plaintiffs' black core usage and color core usage and that this single average value was premised upon a small total annual volume of imports into India of both types of cores. They further claim that the value from the import statistics was aberrational and that Commerce refused to use what they call "legitimate values" from two other independent and corroborating sources that provided separate black and color core values that demonstrated the aberrational nature of the Indian Import statistics-based value.[30]

The "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo, 383 U.S. at 620. Substantial evidence requires that the agency's determination be based on the whole record and the reviewing court must examine all evidence that fairly supports and detracts from the determination. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Commerce considers small-quantity import information or data unreliable when the per-unit value is substantially different from the per-unit values of the larger quantity imports of that product from other countries. Shakeproof, 24 CIT at 490-91.

Commerce claimed that although the volume of cores imported into Indonesia during

_____

[30] The cores data consisted of an undated price quote from an Indian exporter and a price quote dated January 10, 2002, from an Indonesian company for export of cores to the United States.

2000 was substantially greater than that imported into India during the POR, it did not find Indian imports of over 3,400 kgs. of pencil leads from seven different market economy countries to be insignificant. Commerce derived weighted average Indian and Indonesian import values of 7.69 USD/kg. and 6.47 USD/kg. Commerce noted that the weighted-average Indian import price did not substantially vary from the weighted-average Indonesian import price. Commerce decided not to consider the Indian price quotes that the Plaintiffs submitted because they were undated, were export prices, and it was not clear that any sales were made pursuant to these quotes. It did not consider the Indonesian price quotes placed on the record because the quotes were for sales to the United States, rather than for sales within a potential surrogate country, and were dated outside the POR. The Indian and Indonesian import statistics each only include a category for black and colored cores together without providing any more details regarding the types of cores being imported. Moreover, the price quotes for cores were placed on the record by a party affiliated with a U.S. importer of subject merchandise. Therefore, Commerce valued black and color cores based on Indian import statistics, which it concluded was the best available information on the record. Issues and Decision Memorandum, Comment 4 at 12-13; Defendant's Opposition at 10. This decision is supported by substantial evidence and in accordance with the law.

## VI.
## Conclusion

For the foregoing reasons, Commerce's decision in the Final Results, 67 Fed. Reg. 48,612 (July 25, 2002), as amended in the Amended Final Results, 67 Fed. Reg. 59,049 (Sept. 19, 2002) is remanded to Commerce for proceedings consistent with this opinion. On remand, Commerce

must articulate specifically the portions of the existing collapsing statutes and regulations which are applicable or inapplicable in the NME context. It must then provide the court with a clearly articulated methodology for collapsing companies in NME countries.

Commerce must reevaluate Guangdong's rate in light of the court's decision that its collapsing methodology was not in accordance with the law. It must also reevaluate the application of the China-wide rate to Guangdong because Commerce effectively applied adverse facts to a participating and cooperative respondent.

Commerce's refusal to correct Kaiyuan's translation error is supported by substantial evidence and in accordance with the law as is its decision to use values from black and color cores based on Indian import statistics.


                                               __/s/ Evan. J. Wallach__
                                                       Judge


Dated: May 14, 2004
       New York, New York